### NATIONAL LABOR RELATIONS BOARD
v.
### CAMBRIA CLAY PRODUCTS CO.
No. 12072.

United States Court of Appeals, Sixth Circuit.
July 7, 1954.

Frederick U. Reel, Washington, D. C. (George J. Bott, David P. Findling, A. Norman Somers, Frederick U. Reel, Thomas R. Haley, N.L.R.B., Washington, D. C., on the brief), for petitioner.

J. Mack Swigert, Cincinnati, Ohio (J. Mack Swigert, Charles D. Lindberg, Cincinnati, Ohio, on the brief; Miller, Searl & Fitch, Portsmouth, Ohio, of counsel), for respondent.

Before McALLISTER and MILLER, Circuit Judges, and GOURLEY, District Judge.

McALLISTER, Circuit Judge.

The National Labor Relations Board filed a petition for enforcement of its order against respondent for claimed violation of Sections 8(a)(1), (3), and (5) of the National Labor Relations Act,[1] setting forth that the company had interfered with, restrained, and coerced its employees in the exercise of their rights to self-organization and collective bar-

1. Title 29 U.S.C.A. § 151 et seq.

gaining through agents of their own choosing, as guaranteed by Section 7 of the Act, through discharging employees because of their union activity, refusing to reinstate employees who had been on strike, and declining to bargain collectively with the representative of its employees.

For ten years prior to 1951, the United Brick and Clay Workers of America, AFL, Local No. 879, had represented the production employees of the Cambria Company's plants at Blackfork, Ohio. Blackfork is a company town, and respondent owns all the land around the town comprising an area of approximately 6,000 acres. During the period aforesaid, the union had negotiated collective bargaining agreements between the employees and the company. The company has two plants at Blackfork, one, about a mile and a half from the other. They are designated, respectively, the silica plant and the clay plant. Employees of the silica plant customarily had a meeting of the union at 4:00 p. m. on the first Tuesday of each month at the Blackfork schoolhouse, and on these occasions, it was the practice of the employees on the afternoon shift to leave work to attend the meeting; and the company, aware of this practice, regularly deducted an hour's wages from the pay of such employees who attended the meeting.

On August 8, 1951, Hubert S. DeHart replaced Earl Mickey as superintendent of the silica plant. At the time DeHart became superintendent, Mr. E. E. Davis, Vice President of the company in charge of operations, instructed him to issue a rule forbidding the practice of employees leaving the job before their workday ended, unless prior permission from their superintendent or foreman had been obtained. It appears that when such crews would leave early, it would automatically close down the job then being worked upon. Accordingly, DeHart thereafter told Sherman Sparks, the union committeeman, that he could not allow the employees to leave their jobs and go to meetings in the prior accustomed way;

and he requested Sparks and Oscar Straight, a former union committeeman, to bring the matter up in the union meeting; and this was done. On the occasion of the conversation with Sparks and Straight, DeHart told them that he could fire the employees for leaving work early to attend the union meetings but that it was all right to go to the meeting "that night." DeHart also told Straight that the employees did not have the right to shut the job down and all attend the meeting together; and that they would have to send committeemen instead. Nevertheless, thereafter, on November 7, 1951, the workers of the set gangs at the silica plant left work about 4:00 P.M. to attend a union meeting, without requesting prior permission from any official of the company.

Before leaving the plant, however, one of the employees told Kenneth Cofer, who was the checker with the set gang on the shift, that they were leaving for the meeting, and received no reply from him. Cofer was an hourly-paid employee, but had the authority to tell the men where they were expected to work and what they were to do. When there was no work to be done in the kiln, he would put them to work elsewhere; and he also directed them from time to time as to what kind of brick to set. It appears from the evidence introduced on behalf of the company that, at least before the new rule was issued by Superintendent DeHart, it was customary for the men to seek authority from Cofer to take time off during working hours, and that, on occasion, he either gave or denied such permission; and that the employees went to see him for this purpose even when the superintendent was present. On the day in question, after the men returned from the meeting, they were told by Cofer that they were discharged.

■■ With respect to the discharge of the employees for taking time off during working hours to attend the union meeting, it nowhere appears in the evidence that any of the employees or union committeemen were told that they would be discharged if they left work

early to attend the meeting. They had followed this practice for years. Although the union committeemen were told by the new superintendent that he could not permit the men to leave early without permission and that he could fire them for doing so, all the witnesses on this point testified that they did not understand they would be fired for leaving early to go to the meeting; and the union committeeman, a witness for the respondent company on the hearing, to whom the superintendent spoke regarding the new rule, testified that he did not understand from what the superintendent told him that the employees who attended union meetings as in the past would be fired without warning. Superintendent DeHart, although present at the Board hearing, did not testify. No notice was placed upon the bulletin board by any officials of the company respecting the new rule. Some months after the discharge of the men, Superintendent DeHart told the night superintendent at the silica plant, according to the latter's testimony, that the employees above mentioned "were mostly troublemakers and that was his chance to get rid of them. He said he told them not to go to these meetings, and they went anyhow * * that as long as they were union men they didn't want them * * * they fired those fellows on account of the union activities." The credibility of the night superintendent is assailed by respondent as being in contradiction of the testimony of other witnesses and because of the fact that he was an ex-convict, with a grudge against the company. It does not, in fact, appear that the witness had a grudge against the company. In any event, the Trial Examiner, in spite of the criminal conviction of the witness, characterized him as honest and sincere; and Superintendent DeHart did not contradict his testimony. The trier of facts, in this case the Board, is the judge of the credibility of the witnesses; and we see nothing in its acceptance of this testimony that would justify a court on review in rejecting it. Under the foregoing circumstances, we cannot say that,

viewing the record as a whole, the findings of the Board that the employees in question were discharged for their union activities were not sustained by the evidence.

There was also substantial evidence that respondent exerted coercive pressure upon employees to withdraw from the union. It is true that such evidence is strongly controverted and, persuasive of the company's contention, it appears that their inquiry of employees as to whether they wished to withdraw from the union was consented to by the union's representative who approved the preparation of typewritten withdrawal slips to be signed by any member of the union who wished to discontinue his membership therein on the ground that, as the union's representative declared, a disgruntled union man was of no use to the union anyway. However, the evidence of the exertion of coercive pressure in a form other than the mere circulation of the withdrawal slips, is substantial, on the record, viewed as a whole. As to the employees, Miller, Friend, and Hall, who were, as the company claimed, discharged for leaving their work early, there was convincing enough evidence that it was the custom of employees on the set gangs, including the hourly-paid workers, to leave the plant when the piece-rate workers completed their quota before the end of the shift on the apparently accepted understanding that they had completed their allotted work at that time; and there was substantial evidence from which reasonable inferences could be drawn that the real reason for the discharge of these workers was because of their loyalty to the union in face of the effort of the company to have them withdraw from the union and its intention to terminate the employment of such men as were strong supporters of the union.

As to the discharge of Craddolph, who had worked for the company twenty-six years, and Galliamore, who had been an employee for thirty-three years, it is our view that there was substantial evidence from which reasonable inferences could

be drawn that their discharge resulted from their union activities. They were both members of the union grievance committee and on two occasions, had gone to the silica plant, once, to investigate Friend's discharge, and again, to discuss with the officials the above mentioned discharges of both Friend and Hall. On this occasion, they had tendered a written grievance to the officials who had handed it back saying that they were "through with all that, we are not going to bother with that sort of thing any more." The respondent company insists this statement can only be interpreted as meaning that it would not permit committeemen from one plant to "process" grievances from the other plant. But it was for the Board to say whether the company thereafter discharged Craddolph and Galliamore because of their union activity in the matter. It is not clear exactly what jurisdiction Craddolph and Galliamore had with reference to processing grievances of employees at the silica plant. Their committee work was mainly concerned with the clay plant, but Galliamore testified they were at the silica plant because certain silica employees who had been in charge had been fired. There seemed, however, to have been sufficient committeemen among the silica workers to take care of their grievances. In any event, the evidence discloses that they were engaged in investigating grievances and discharges. Later, Craddolph and Galliamore had gone to the silica plant to discuss the discharges with three or four of the employees. At this time, the superintendent saw them there and upon being told who they were, said to Superintendent Frabie, "We will have to file trespassing charges against them, they work at the clay plant, they don't work at the silica plant." The next morning, at a meeting of the supervisors, it was decided to fire both men, and the superintendent, during the meeting, remarked, according to testimony introduced on behalf of the Board, that they wouldn't have to worry because one was a union vice president and the other, a committeeman. While the company contended that these two men were engaged in trying to break up a dinner given for employees at the silica plant and were causing and inciting trouble, there was no evidence of any disorder on their part, or as a result of their visits to the silica plant. The conclusion of the Board that the discharge of these two veteran employees was in violation of Section 8(a) (3) of the Act is sustained by the evidence.

When Craddolph and Galliamore were discharged, the union called a strike. During the strike, there was much violence, assaults upon employees loyal to the company, dynamiting of the chief gas supply main to the company which was used in the making of its products, rifle and shotgun fire, and bloodshed, although, miraculously, no one was killed. Two witnesses for the company testified that they had seen twelve named strikers carrying shotguns or rifles in the nearby woods from which heavy gunfire came during one of the days of the strike. Nine of the employees so named appeared as witnesses on the hearing and denied carrying firearms in the woods or engaging in the shooting near the plants. The Trial Examiner believed the testimony of these employees and found that the two witnesses who testified against them were not worthy of credibility; and the Board adopted the views and findings of the Trial Examiner. Ten of the employees in question were ordered reinstated; two were excluded from reinstatement on other grounds. There is no basis in this case on which this court could set aside the findings of the Trial Examiner and the Board because of a difference of opinion as to the credibility of witnesses who have not been before us; and, therefore, the order of reinstatement of the employees in question must be sustained.

As to the reinstatement of certain of the employees who were claimed to be implicated in the dynamiting of the gas main and of other employees who were claimed to be implicated in the shooting and wounding of a fellow worker, the evidence was in sharp contradic-

tion, and was inconclusive. Certainly, on what appears before us, there are matters that give rise to grave misgivings: one of the employees on strike, who was a loyal member of the union and a participant in the picketing, testified that, before the gas main was dynamited, the union representative stated that if enough gas was let into the plant to operate the kiln, "you boys know what to do. I can't tell you what to do, but you boys know what to do." The union organizer denied having made any such statement and explained that he had been told that there was only 30 pounds of pressure in the main and that he remarked that that was not enough to burn brick. He further testified that he had made this statement after the company had started to take the employees back to work, and at a time about six weeks prior to the explosion. On this same question, the evidence discloses that during the strike, a former employee bought several sticks of dynamite and fuses from a firm in the neighborhood; and that after the bombing of the home of a non-striking worker, a fuse was found nearby which was of the same type as that bought by the employee in question. This man was not one of those ordered to be reinstated; and there is no evidence linking other employees with the crime. Unauthorized acts of violence on the part of individual strikers are not chargeable to other union members in the absence of proof that identifies them as participating in such violence. National Labor Relations Board v. Deena Artware, Inc., 6 Cir., 198 F.2d 645, 650. Findings sustaining the contentions of either the Board or respondent company could be said to be justified on the part of the fact finder, and while this court might have arrived at conclusions contrary to those of the Board had it seen the witnesses and heard their testimony, we cannot say that the findings of the Trial Examiner and the Board were not sustained by the evidence on the record as a whole.

■ The Board ordered the reinstatement of Clarence Friend, who, accompanied by his two brothers, had gone to the home of a non-striking employee, Ernest Lawson, and repeatedly assaulted him with his fists, knocking him to the ground and leaving him lying there, solely because Lawson had continued, with others, to work at the plant. The purpose of this planned and deliberate assault was to beat Lawson up for not joining the strike, and to keep him from working in the future. In fact, Friend told him this before he assaulted him. The Board also reinstated William Evans, who had been admittedly discharged for cause; and ordered the reinstatement of Willie Davis and Clee Woodruff, who had quit work before the strike—one of whom at the time was receiving unemployment compensation, and the other, processing a claim for state labor compensation on the ground that he was unable to work because of silicosis. In addition, Lloyd Horner and William Bailey, who had both quit the employment of the company, were ordered reinstated. The objections of respondent to the order of reinstatement lacked the desirable specificity under Section 10(e) of the Act; but in the face of the admitted facts, enforcement of that part of the order reinstating these men who clearly are not entitled to reinstatement will not be decreed.

■ It is contended by respondent company that if it had an honest belief as to the misconduct of employees, it was justified in refusing to reinstate them, in accordance with the authority of Rubin Brothers Footwear v. National Labor Relations Board, 5 Cir., 203 F.2d 486. However, in National Labor Relations Board v. Industrial Cotton Mills, 4 Cir., 208 F.2d 87, certiorari denied 347 U.S. 935, 74 S.Ct. 630, it was held that the Board had the power to order an employer to reinstate a striking employee whom the employer had refused to reinstate because of an honest but mistaken belief that such employee was guilty of strike misconduct; and with this view, we concur. To the same effect, see Cusano v. National Labor Relations Board, 3 Cir., 190 F.2d 898, and Salt

River Valley Water Users' Ass'n v. National Labor Relations Board, 9 Cir., 206 F.2d 325.

 The two veteran employees heretofore mentioned, Craddolph and Galliamore, had, during the course of the strike, violated an injunction of the Court of Common Pleas of Lawrence County, Ohio, prohibiting violence and limiting pickets to two each at each of the respective plants. With four other employees, they were found guilty of contempt of the court's injunctive order and were fined $500 each and sentenced to ten days in jail. We have before us only the order of the court of common pleas finding them guilty of contempt and fining and imprisoning them as above set forth. Whether there was violence in disobeying the injunction does not appear in the evidence. Upon the evidence before us, we cannot say whether the conduct of Craddolph and Galliamore was such as to justify respondent company in refusing to reinstate them. It is not the fact that there was a violation of the injunction that determines whether they should or should not be reinstated, but the type of conduct they engaged in, and the manner and nature and seriousness of their violation of the order. It is not every law violation or disobedience of an injunction by striking employees that brings their status within the ruling of the Supreme Court in National Labor Relations Board v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, and bars their reinstatement, as contended by respondent company. See National Labor Relations Board v. Stackpole Carbon Co., 3 Cir., 105 F.2d 167, 176; Republic Steel Corp v. National Labor Relations Board, 3 Cir., 107 F.2d 472, 479; National Labor Relations Board v. Elkland Leather Co., 3 Cir., 114 F.2d 221, 225; National Labor Relations Board v. Reed & Prince Mfg. Co., 1 Cir., 118 F.2d 874, 888. While the amount of the fine and the ten days of imprisonment imposed by the court of common pleas would seem to indicate a serious offense, there is no proof as to the facts. We wish to know what the conduct actually was; whether it resulted from improper motives, and was of a violent, or of such a serious character as to render the employees unfit for further service. See National Labor Relations Board v. Illinois Tool Works, 7 Cir., 153 F.2d 811, 815. Since we have no evidence on the point and no findings, an order will be entered directing the Board to take such additional evidence as may be necessary to disclose the nature of the conduct for which Craddolph and Galliamore were held in contempt; and respondent shall have the right to participate as in the original hearing. Upon the taking of the evidence, the Board may modify its findings as to the facts upon this aspect of the case or make new findings by reason of additional evidence so taken and filed, and it shall file such modified or new findings which, if supported by substantial evidence on the record as a whole, shall be conclusive, and shall file its recommendations, if any, for the modification of its original order. See Title 29 U.S.C.A. § 160(e) and (h).

 With respect to the Board's findings that respondent company refused to bargain with the union in violation of Section 8(a)(5) of the Act, we are of the view that the evidence does not sustain such findings. On January 28, 1952, the union sent a letter to the company terminating the existing contract as of its expiration date, March 31, 1952. On March 3, 1952, the company requested the union to submit a proposal for a new contract, which the union did, submitting it to the company on March 11; and on March 18, the union wrote the company requesting a bargaining meeting. March 20 was set as a tentative date for the meeting, and the representatives of the company appeared on that date at the usual meeting place, but no union representatives were present. A meeting was then arranged for April 24. The parties met on that date, and afterward, on April 30, May 2, May 7, May 19, May 21, July 1, and July 7. An examination of the record discloses that the company was engaged

in bargaining in good faith, and that the union business agent, Allie Messer, in charge of the negotiations for the employees, was of this opinion. The meetings were long and were conducted with good temper and in the best of feeling by the officials of the company on one side and numerous representatives of the employees on the other; and most of the matters in controversy were agreed upon. One, however, was the stumbling block—the insistence upon a union shop. The company was opposed to this condition; the union would not give in on it. In June, 1952, the Federal Mediation and Conciliation Service entered the dispute and Commissioner Bentley, of the Service, in that month and in July, arranged for bargaining meetings. After the last of such meetings, it was left rather in the air as to when the next meeting would be held and it was loosely agreed that Mr. Bentley would be the intermediary in the arrangement of future meetings; but the company concluded that a stalemate had been reached because of the union's insistence on the union shop and the company's opposition to it; and neither the company nor the union appears to have asked Bentley to call another meeting. The union continued, however, to write letters asking the company to set dates for bargaining conferences; but none of the letters indicated any change in the union's insistence on the union shop provision, and copies of none of the letters were sent to Commissioner Bentley, the mediator. Under Section 203(b) of the Act, it was the duty of the Federal Mediation and Conciliation Service, acting through Commissioner Bentley, to use its best efforts to bring the parties to an agreement, and we assume that it performed its duties. Under the circumstances of the case and in the absence of evidence to the contrary, there arises a strong inference that Commissioner Bentley arranged no further meetings because of the absence of any prospects of bringing the parties to an agreement. Counsel for the company did, however, attempt to reach the union representative by telephone and left a number of messages that he had called; but the union representative, having been absent at the time, never thereafter communicated with counsel. There was no refusal on the part of the company—after four months of negotiations—to bargain with the union in violation of the Act, for "the Act does not encourage a party to engage in fruitless marathon discussions at the expense of frank statement and support of his position." National Labor Relations Board v. American National Insurance Co., 343 U.S. 395, 404, 72 S.Ct. 824, 829, 96 L.Ed. 1027. There was no general unwillingness on the part of the company to negotiate a contract satisfactory to itself as well as the union. See American National Ins. Co. v. National Labor Relations Board, 5 Cir., 187 F.2d 307; National Labor Relations Board v. I. B. S. Mfg. Co., 5 Cir., 210 F.2d 634.

When a genuine impasse is reached, an employer, unless conditions change, usually may abstain from further negotiations. National Labor Relations Board v. Norfolk Shipbuilding and Drydock Corp., 4 Cir., 195 F.2d 632, 635. Negotiations had continued for more than three months after the strike was called. As said by Judge Learned Hand in National Labor Relations Board v. Remington-Rand, Inc., 2 Cir., 94 F.2d 862, 872: "the act does not attempt to settle industrial disputes; it leaves the parties to the resultant of their opposed economic powers; and while it does force them to treat with each other, it may be assumed to contemplate only bona fide negotiation. Hence it is no doubt true that it does not require further negotiation after it becomes apparent that a settlement is impossible. A union may at times seek to give the appearance of wishing to treat, after it knows that all chance of agreement is gone; in such conflicts each side generally wishes to place the odium of rupture upon the other." "Assuming, as urged by the Board, that a closed shop demand is a proper subject for bargaining, we do not believe that respondent was required to

continue the discussion indefinitely. Both sides had endeavored for many months to agree and they were unable to do so. Neither side was required to accept the proposal made by the other. The same thing may be said for other matters in dispute, which had long been considered and discussed by the parties. As stated, the occurrences of this date, when taken into consideration with what had preceded, as must be done, do not justify the conclusion of a refusal to bargain." National Labor Relations Board v. Algoma Plywood & Veneer Co., 7 Cir., 121 F.2d 602, 606.

We consider that in spite of the discharges of the employees above mentioned for their union activities, the evidence, on the record viewed as a whole, does not sustain the Board's conclusion that there was a refusal on the part of respondent company to bargain with the union in violation of the Act.

 It is claimed by respondent that, as to the portion of the order of the Board requiring the reinstatement with back pay of eighty men who had been on strike, there was no proper basis established for the order, since there was no proof that the company had any jobs available for these men when they applied for reinstatement, or thereafter. However, the general counsel of the Board made out a prima facie case by showing that respondent had failed to reinstate certain unfair labor practice strikers. Proof that jobs were unavailable was an affirmative defense, and the burden of establishing it rested upon respondent company. National Labor Relations Board v. J. G. Boswell Co., 9 Cir., 136 F.2d 585, 597. In any event, respondent company will have a further opportunity to demonstrate the period during which curtailment of its operations would affect or eliminate back pay liability to any or all of these employees, in subsequent compliance proceedings. National Labor Relations Board v. National Garment Co., 8 Cir., 166 F.2d 233, 239; National Labor Relations Board v. Norfolk Shipbuilding and Drydock Corp.,

4 Cir., 172 F.2d 813, 816; Home Beneficial Life Ins. Co. v. National Labor Relations Board, 4 Cir., 172 F.2d 62; National Labor Relations Board v. Bird Machine Co., 1 Cir., 174 F.2d 404, 405; National Labor Relations Board v. Royal Palm Ice Co., 5 Cir., 201 F.2d 667, 668; National Labor Relations Board v. Brown & Root, Inc., 8 Cir., 203 F.2d 139, 147.

In accordance with the foregoing, a decree will be entered granting enforcement of the Board's order, with the exception that reinstatement of the six employees heretofore mentioned as having been improperly reinstated, will be denied; that the Board's finding that respondent did not bargain in good faith will be set aside; and that with respect to the employees Craddolph and Galliamore, the Board will be ordered to take such additional evidence as may be necessary to disclose the actual conduct of the said employees in violating the injunctive order of the Court of Common Pleas of Lawrence County.