308 F.2d 311
 113 U.S.App.D.C. 356
 FRUIT AND VEGETABLE PACKERS & WAREHOUSEMEN, LOCAL 760, and
Joint Council No. 28 of the International
Brotherhood of Teamsters, Chauffeurs,
Warehousemen and Helpers of
America, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 16588.
 United States Court of Appeals District of Columbia Circuit.
 Argued Jan. 22, 1962.
Decided June 7, 1962, Petition for Rehearing Denied Oct. 12, 1962.
 
 Mr. David Previant, Milwaukee, Wis., with whom Messrs. Hugh Hafer, Seattle, Wash., and David Leo Uelmen, Milwaukee, Wis., were on the brief, for petitioners.
 Mr. Melvin J. Welles, Atty., N.L.R.B., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B., were on the brief, for respondent. Mr. Morton Namrow, Atty., N.L.R.B., also entered an appearance for respondent.
 Mrs. Mary Ellen Krug, Seattle, Wash., of the bar of the Supreme Court of Washington, pro hac vice, by special leave of court, with whom Mr. Warren Woods, Washington, D.C., was on the brief for Tree Fruits Labor Relations Committee, Inc., as amicus curiae urging affirmance.
 Before EDGERTON, BAZELON and WASHINGTON, Circuit Judges.
 BAZELON, Circuit Judge.
 
 
 1
 This case presents a question of first impression under 8(b)(4)(ii), a wholly new provision added by the 1959 amendments to the Taft-Hartley Act.[1] The National Labor Relations Board found that the petitioner Union violated that provision by picketing the premises of retail stores to urge customers not to buy products of an employer with whom the Union had a labor dispute. The Union took care that the stores' employees continued to work and that their pick-ups and deliveries were not halted. The case is before us on the Union's petition for review and the Board's cross-petition for enforcement.
 
 
 2
 The Board proceedings were initiated upon unfair labor practice charges filed by Tree Fruits, Inc., an organization of Yakima, Washington, fresh fruit packing and warehousing companies whose employees were represented by the petitioner Union. The parties stipulated to all the facts, waived hearing before a trial examiner, and submitted the case directly to the Board.
 
 This is the substance of the stipulation:
 
 3
 In August 1960, after failing to reach an agreement with Tree Fruits, the Union called a strike against its member companies. When the companies refused to yield, the Union organized a consumer boycott of the struck employers' products. In conjunction with petitioner Joint Council 28, with which the Union is affiliated, it patrolled the premises of Safeway stores in Seattle, Washington, which distributed apples produced by Tree Fruits' members. The patrols consisted of two or three men or women carrying placards which bore the legend:
 
 
 4
 TO THE CONSUMER: NON-UNION WASHINGTON STATE APPLES ARE BEING SOLD AT THIS STORE. PLEASE DO NOT PURCHASE SUCH APPLES. THANK YOU. TEAMSTERS LOCAL 760, YAKIMA, WASHINGTON.
 
 
 5
 Except where the location of stores at the rear of large parking lots prevented, members of the patrol gave customers handbills setting forth the facts of the dispute and reiterating the request that consumers not buy apples produced by Tree Fruits' members.
 
 
 6
 To prevent the picketing from inducing a work stoppage, the Union instructed the pickets to explain to any Safeway employee who might inquire that the only purpose of the picketing was to enlist the cooperation of consumers in not buying apples produced under 'sweatshop' conditions and that the employee should therefore continue to work. The pickets were also told not to patrol employee or delivery entrances, not to make any statement to the effect that Safeway was unfair or on strike, and not to request customers to refrain from otherwise patronizing the stores. All these instructions were obeyed.
 
 
 7
 The Union gave each store manager a copy of the picketing instructions and a notice informing him of the cause of the dispute and the purpose of the patrol. In addition to suggesting that the notice be posted for the benefit os Safeway employees, the Union told the managers:
 
 
 8
 If any of your employees should stop work as a result of our program, or if you should have any difficulties as far as pickups and deliveries are concerned, or if you observe any of the pickets disobeying the instructions which they have been given please notify the undersigned union representative at once and we will take steps to see that the situation is promptly corrected.
 
 
 9
 The closing paragraph of the notice advised that if Washington State apples were not on sale at the store, the manager should notify the Union which would thereupon 'transfer the patrol to another store where Washington State apples are actually being sold.' As a result of these precautions, and as the Union intended, no Safeway employee stopped work and pick-ups and deliveries at the stores were unaffected.[2]
 
 
 10
 Upon these stipulated facts the Board found that the Union had threatened, coerced, or restrained Safeway to force it to cease doing business with Tree Fruits and had thus violated 8(b)(4)(ii)(B). The Board relied upon its earlier decision in Upholsterers Frame & Bedding Workers, 132 N.L.R.B. No. 2 (1961). There it held that picketing the premises of a secondary employer, although addressed solely to consumers, constitutes a threat, coercion, or restraint, and is therefore per se an unfair labor practice. This view, which makes the effect of picketing immaterial, was apparently followed by the General Counsel here, for he offered no evidence concerning the impact of the picketing on Safeway's sales or its relations with the struck firms.
 
 
 11
 The Board insists and the Union denies that the statute completely bans picketing at the premises of a secondary employer. The Union argues that, since the statute makes it an unfair labor practice to 'threaten, coerce, or restrain any person engaged in commerce,' the Board must determine from the circumstances or from the conduct of the picketing whether it is in fact a threat, coercion or restraint. On the other hand, the Board points out that a proviso to 8(b)(4) exempts from the prohibition 'publicity, other than picketing, for the purpose of truthfully advising the public * * * that a product * * * produced by an employer with whom the labor organization has a primary dispute * * * (is) distributed by another employer.' The Board's argument seems to be this: The Conference Committee assumed that 8(b)(4)(ii)(B) as it passed the House prohibited all secondary publicity as a threat, coercion or restraint. The Committee therefore added the proviso in order to exempt certain forms of publicity from that prohibition. But since secondary picketing is specifically exempted from the proviso, it remains prohibited.
 
 
 12
 In support of its position, the Board urges that the legislative history of the amendatory statute conclusively shows that Congress intended to ban all secondary consumer picketing. The Board cites, for example, the explanation made by (then) Senator Kennedy of the Conference Committee's compromise on the issue of secondary publicity. The Senate conferees, Senator Kennedy explained, insisted upon preserving certain legitimate union rights, including:(c) The right to appeal to consumers by methods other than picketing asking them to refrain from buying goods made by nonunion labor and to refrain from trading with a retailer who sells such goods.
 
 
 13
 Under the (House) Landrum-Griffin bill it would have been impossible for a union to inform the customers of a secondary employer that that employer or store was selling goods which were made under racket conditions or sweatshop conditions, or in a plant where an economic strike was in progress. We were not able to persuade the House conferees to permit picketing in front of that secondary shop, but we were able to persuade them to agree that the union shall be free to conduct informational activity short of picketing. In other words, the union can hand out handbills at the shop, can place advertisements in newspapers, can make announcements over the radio, and can carry on all publicity short of having ambulatory picketing in front of a secondary site.[3]
 
 
 14
 That statement possesses much force, in light of the important role Senator Kennedy played in managing the bill. Nor can we disregard the views of other legislators who thought the statute would ban secondary consumer picketing. See 2 Legis.Hist. 1389, 1426-27, 1454, 1689, 1708, 1712 (1959).[4]
 
 
 15
 Looking solely to the language of the statute, however, we believe the most plausible reading to be that 8(b)(4)(ii) outlaws only such conduct (including picketing) as in fact threatens, coerces or restrains secondary employers, and that the proviso is intended to exempt from regulation 'publicity other than picketing' even though it threatens, coerces or restrains an employer. For example, handbilling which has a severe economic impact on the secondary employer's business might be 'coercive,' but it would be exempted from regulation by the proviso. Perhaps the Board's view-- that the proviso reflects the draftsman's assumption that without it all secondary publicity is banned because it necessarily threatens, coerces or restrains a secondary employer-- can be squared with the statory language. But that appears to be less plausible reading of the statute.
 
 
 16
 In analyzing the legislative history, moreover, we must be ever mindful that we do a disservice to Congress if we construe the statute on the basis of the legislative history in a manner which would raise serious constitutional questions. Particularly is this so where there is no elucidating House, Senate or Conference report on the precise point involved, and where one of the sponsors of the legislation made clear the desire to avoid constitutional questions. Cf. International Ass'n of Machinists v. Street, 367 U.S. 740, 765-768, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961). Thus Representative Griffin stated:
 
 
 17
 Of course, this bill and any other bill is limited by the constitutional right of free speech. If the purpose of the picketing is to coerce the retailer not to do business with the manufacturer * * * it would be covered by our bill.[5]
 
 
 18
 At the same time in referring to regulation of consumer picketing by 8(b)(7), which was added to the Act together with 8(b)(4)(ii), Representative Griffin further noted:
 
 
 19
 This is subject, however, to the constitutional rights of free speech. Unless the picketing is for the coercive purpose indicated, it would not be affected by this language. In other words, whether it is the handing out handbills or putting an ad in the paper or picketing, if it is done in such a way so as clearly to be nothing more than an exercise of free speech, then the provision would not be violated.[6]
 
 
 20
 The constitutional difficulties inherent in the Board's interpretation of the statute are by no means minimal. Problems arise under the First Amendment whenever picketing is restrained. See Thornhill v. Albama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). See also National Labor Relations Board v. Drivers' etc., local, 362 U.S. 274, 284, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960). This is because picketing combines constitutionally protected speech for the purpose of communicating ideas with a 'signal' to act which must yield to the states' power 'to set the limits of permissible contest open to industrial combatants.' Giboney v. Empire Storage & Inc Co., 336 U.S. 490, 499, 69 S.Ct. 684, 93 L.Ed. 834 (1949). See International Brotherhood of Teamsters, etc. v. Vogt, 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957).
 
 
 21
 Mr. Justice Douglas has explained in an oft-cited concurring opinion why picketing is more than speech: 'Picketing by an organized group is more than free speech, since it involves patrol of a particular locality and since the very presence of a picket line may induce action of one kind or another, quite irrespective of the nature of the ideas which are being disseminated. Hence those aspects of picketing make it the subject of restrictive regulation.' Bakery & Pastry Drivers & Helpers Local, etc. v. Wohl, 315 U.S. 769, 776-777, 62 S.Ct. 816, 86 L.Ed. 1178 (1942) (Douglas, J., concurring).
 
 
 22
 The response to which Mr. Justice Douglas referred is characteristic of unionized employees to whom pickets have traditionally addressed their appeal. Such employees are subject to group discipline based on common interests and loyalties, habit, fear of social ostracism, or the application of severe economic sanctions. Hence, they may refuse to work or to make pickups and deliveries for a secondary employer, thereby causing him serious and immediate economic injury. See Cox, Strikes, Picketing and The Constitution, 4 Vand.L.Rev. 574, 594 (1951). In that context, picketing is more than 'pure' speech.
 
 
 23
 In this case, however, the Union sought to enlist the support of members of the public at large and successfully sought to prevent its picketing from having the customary 'signal' effect on employees. Each prospective patron could read the Union's signs and literature and determine, in the light of his own interests and convictions, what course he would follow. And, as we have pointed out, the record does not show any injury to Safeway, the secondary employer. Indeed, Tree Fruits, not Safeway, is the charging party here. Thus it may well be that the picketing in this case is closer to the core notion of constitutionally protected free speech than the picketing the Supreme Court has held may be banned.[7]
 
 
 24
 It should be borne in mind that this type of 'do not patronize' appeal to the general public by peaceful pickets is not restricted to labor unions. Picket lines have been used to voice objection and effect changes in the policies of business enterprises which discriminate between races,[8] purvey objectionable films, remain open on Sunday,[9] purchase materials abroad-- whether from friend or foeand distribute products deemed harmful or immoral.
 
 
 25
 It is true that even if picketing is in a given case 'pure speech,' this does not bar Congress or the states from prohibiting such appeals in all circumstances. Cf. Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L.Ed. 985 (1950). Statutes infringing upon free speech are enforceable if the gravity of the evil the legislature seeks to prevent, discounted by its improbability, justifies the infringement.[10] But in the absence of a showing that a substantial economic impact on the secondary employer has occurred or is likely to occur, we would be hard-put to find a constitutional justification for prohibiting a union from using picketing as the form of making 'do not patronize' appeals, so long as the picketing is conducted in an entirely peaceful and non-coercive manner, is addressed solely to consumers, and has no side effects which might be a basis for distinguishing it from any other form of publicity. Cf. Lebus, etc. v. Building & Const. Trades Council, 199 F.Supp. 628 (E.D.La.1961).[11]
 
 
 26
 We are thus constrained, in reading the statute and its legislative history, to accord proper weight to the cases which teach that when two interpretations are possible, courts must construe a statute narrowly to avoid reaching constitutional issues. We must also give full consideration to the stated desire of key legislators to avoid constitutional encroachments.
 
 
 27
 Viewed as a whole, the statute does not reflect Congress' intent to ban all secondary consumer picketing. What Congress has said is that it shall be an unfair labor practice for a union 'to threaten, coerce, or restrain any person engaged in commerce * * * where * * * an object thereof is * * * forcing or requiring any person to cease * * * selling * * * the products of any other producer * * *.' Each of these terms has a meaning; each must be given effect. None can be legislative repealed by reference to the legislative history. It is significant that when Congress wanted to outlaw picketing per se, it knew how to do so, as is evidenced by 8(b)(7), which forbids a union in certain circumstances 'to picket or cause to be picketed, any employer' if its object is to force him to recognize an uncertified union.
 
 
 28
 As we construe the statute, it condemns not picketing as such, but the use of threats, coercion and restraint to achieve specified objectives. Some picketing might come within the ambit of that prohibition. But here, there was no work stoppage, no interruption of deliveries, no violence or threat of violence. The record does not show whether pickets 'confronted' consumers or whether consumers felt 'coerced' by their presence. Nor does the record show that the picketing-directed against only one of hundreds of products sold by Safeway-- caused or was likely to cause substantial economic injury.
 
 
 29
 Since the Board proceeded on the erroneous premise that the statute completely bans consumer picketing at the premises of a secondary employer, we remand the case to the Board for further proceedings consistent with this opinion. Under that remand the Board is free to reopen the record to receive evidence upon the issue whether Safeway was in fact threatened, coerced, or restrained.[12]
 
 
 30
 Reversed and remanded.
 
 
 
 [1]
 In relevant part, 8(b)(4)(ii) reads:
 'It shall be an unfair labor practice for a labor organization or its agents--
 '(4) * * * (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is--
 '(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;
 '* * * provided further, That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the pulic, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.'
 Section 704(a) Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 542, 29 U.S.C.A. 158(b)(4)(ii).
 
 
 [2]
 The Board found that picketing conducted in this manner is unlikely to cause work stoppages. Fruit & Vegetable Packers & Warehousemen Local 760, 132 N.L.R.B. No. 102, p. 6 (1961)
 
 
 [3]
 2 Legislative History of the Labor-Management Reporting and Disclosure Act 1432 (1959), cited hereinafter as Legis.Hist. To the same effect, see 2 Legis.Hist. 1388-89
 
 
 [4]
 See also 2 Legis.Hist. 1007, 1037, 1194, 1377, 1383, 1384, 1471; Cox, The Landrum-Griffin Amendments to the National Labor Relations Act, 44 Minn.L.Rev. 257, 274 (1959); Fleming, Title VII: The Taft-Hartley Amendments, 54 N.W.L.Rev. 666, 690-91 (1960); Goldberg & Meikeljohn, Title, VII: Taft-Hartley Amendments with Emphasis on the Legislative History, 54 N.W.L.Rev. 747, 757 (1960)
 
 
 [5]
 2 Legis.Hist. 1615
 
 
 [6]
 Ibid
 
 
 [7]
 See generally Samoff, Picketing and the First Amendment: 'Full Circle' and 'Formal Surrender,' 9 Lab.L.J. 889 (1958); Note, 107 U.Pa.L.Rev. 127 (1958)
 
 
 [8]
 New Negro Alliance v. Sanitary Grocery Co., 303 U.S.552, 58 S.Ct. 703, 82 L.Ed. 1012 (1938)
 
 
 [9]
 Ex parte Lyons, 27 Cal.App.2d 293, 81 P.2d 190 (1938)
 
 
 [10]
 Dennis v. United States, 341 U.S. 494, 510, 71 S.Ct. 857, 95 L.Ed. 1137 (1951). See Whitney v. California, 274 U.S. 357, 372, 374, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (concurring opinion of Brandeis, J.). See generally Richardson, Freedom of Expression and the Function of Courts, 65 Harv.L.Rev. 1 (1952)
 
 
 [11]
 We do not reach the question of what 'side effects' might be sufficient to remove picketing from the category of pure speech
 The Board has construed the statute to permit unions to organize consumer boycotts by means 'other than picketing.' American Fed'n of T.V. and Radio Artists, 134 N.L.R.B. No. 141 (Dec. 27, 1961). See Local 154, Internat'l Typographical Union, 135 N.L.R.B. N. 96 (Feb. 13, 1962); Local 142 Plumbers Union, 133 N.L.R.B. No. 33 (Sept. 22, 1961). The questions arise whether the consumer boycott can be said, in light of Congress' tolerance of it, to be an evil of sufficient gravity to justify complete suppression of picketing, cf. American Communications Ass'n v. Douds, 339 U.S. 382, 400-401, 70 S.Ct. 674, 94 L.Ed. 925 (1950); Dennis v. United States, supra note 9, or whether the explicit exemption of other forms of communication from the reach of the statute saves its constitutionality. Cf. Poulos v. New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed. 1105 (1953). See also Railway Express Agency, Inc. v. New York, 336 U.S. 106, 110, 69 S.Ct. 463, 93 L.Ed. 533 (1949); Central Lumber Co. v. South Dakota, 226 U.S. 157, 160, 33 S.Ct. 66, 57 L.Ed. 164 (1912). These questions are not now before us, however, and we do not decide them.
 
 
 [12]
 See National Labor Relations Board v. Katz, 289 F.2d 700, 709 (2d Cir. 1961); National Labor Relations Board v. Cambria Clay Products Co., 215 F.2d 48 (6th Cir. 1954); National Labor Relations Board v. Electronics Equip. Co., 194 F.2d 650 (2d Cir. 1952)