NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

PLASTILITE CORPORATION,
Respondent.

No. 18443.

United States Court of Appeals
Eighth Circuit.

March 30, 1967.

Nancy M. Sherman, Atty., N.L.R.B., Washington, D. C., for petitioner. Arnold Ordman, Gen. Counsel, N.L.R.B., Washington, D. C., Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel and Burton L. Raimi, Atty. N.L.R.B., Washington, D. C., were on the brief with her.

John E. Tate, of Nelson, Harding, Acklie, Leonard & Tate, Lincoln, Neb., for respondent.

Before VAN OOSTERHOUT, GIBSON and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

This case is before the Court upon the petition of the National Labor Relations Board pursuant to Section 10(e) of the National Labor Relations Act, as amended (61 Stat. 136), 73 Stat. 519, 29 U.S.C. § 151 et seq., for enforcement of its order against respondent (Plastilite Corporation), issued June 21, 1965, and reported at 153 NLRB No. 7.

■ The Board adopted the findings, conclusions and recommendations of the Trial Examiner.[1] The facts as found by the Trial Examiner are outlined below. The respondent presented no testimony.

Max Lucore, a minor supervisory employee, was discharged by the respondent on December 12, 1963, because of a dispute regarding his hours of employment. Lucore directed the work of two (2) employees, and was responsible for maintaining the machines of his subordinates. However, other employees further along in the production process were dependent upon Lucore's performance of these duties in order to meet their own quotas. Lucore had been helpful to the employees by enabling them to meet their quotas and perform their tasks with greater efficiency. He not only relieved employees when they left their machines for short periods, but, on one occasion, defended an employee against a charge of slow production by showing the fault to be with the machine rather than with the employee's lack of skill.

Later the same day, Lucore was fired and twenty employees decided to strike in protest of his discharge. Before striking, however, Mable Kuklinski, the employees' spokesman, met with officers of the respondent and notified them of the decision to strike and the reason therefor. The respondent's president asked Kuklinski to keep the employees at work, promising to discuss the matter later in the day with them. The employees remained at work awaiting the promised talk by the respondent's president. When the meeting had not been called by one hour prior to quitting, the employees struck.

The strikers proceeded to a downtown Omaha bar where they held a meeting discussing Lucore's discharge and other grievances, including job quotas and factory ventilation. Mable Kuklinski, acting as the spokesman for the group, called Carl Lambach, a senior stockholder and

1. The Board's decision discussed in detail the right of employees to strike in protest of the discharge of a minor supervisory employee, and added a paragraph extending notice requirements to members of the Armed Forces. The Board found that in September, 1963, the respondent violated Section 8(a) (1) of the Act by promising its employees a wage increase if they refrained from joining a union and by requesting certain employees to report any union activities. This finding is not challenged on this appeal, and since it is supported by substantial evidence, it is affirmed.

father of Fred Lambach, the Company treasurer, at his home in Iowa and requested that he come to Omaha to meet with the employees. He said he would meet with them the following Monday, but urged the strikers to return to work the next day, Friday. Kuklinski replied that they would not return until the situation was settled.

That evening, Kuklinski and six other employees went to the plant to solicit support for the strike from the night shift. Their effort was unsuccessful.

On Saturday, December 14th, the Company president offered Kuklinski's position, as assistant supervisor, to Ethel Micek, one of the strikers, on the condition that she immediately return to work. The new job would pay $1.70 per hour as compared to the $1.40 per hour she had been receiving. Micek said she would think it over and notify him of her decision Monday morning.

On Sunday afternoon, December 15, all but three of the strikers met at Max Lucore's home where they again discussed their grievances. Kuklinski called the Company treasurer, Fred Lambach, and asked him to come to Lucore's home and discuss the situation. He refused, and stated that all the strikers' jobs had been filled. When Kuklinski reported this to the assembled strikers, they asked her to call the treasurer again and inform him of his father's promise to confer with them. She complied but was told by Lambach that his father's promise was based on the condition that the strikers return to work Friday morning, and that since they had not complied with the condition, his father would not meet with them. Kuklinski replied that the employees had no alternative but to contact a union, to which Lambach said, "That's your privilege."

On Sunday evening, Ethel Micek's sister called Fred Lambach asking to get her job back. She was told to call the Company president on Monday. She made the call and was asked if she had accompanied the girls who urged the night shift to join the walkout. Although she had, she denied involvement and was reinstated by the president. Early Monday morning, two other strikers, who requested reinstatement, were also rehired.

Ethel Micek met with the Company president on Monday morning, and informed him that she would return to work in Mable Kuklinski's job at the higher salary if he would agree not to rehire her. The president agreed. He then gave her cards containing the strikers' names, and asked that she indicate those she thought would be "good" to call back. When the president and Micek came to a card carrying Mable Kuklinski's name,[2] he set it aside, along with those she had pointed out as carrying the names of Kuklinski's relatives.

The president then instructed Micek to recall all of the strikers, except Kuklinski, her four relatives,[3] and three other employees who had accompanied her to the plant on Thursday night. All but two of those called by Micek accepted the reemployment offer. The two who refused said they felt "we should all go back together." On Tuesday, seven more strikers called by Micek returned to work.[4]

However, on Monday morning, sixteen strikers had signed authorization cards with Sheet Metal Workers International Association Local Union No. 3. The union representative immediately wrote the respondent a letter requesting recognition and demanding reinstatement of the strikers by Wednesday, December 18.

2. The respondent's Brief describes Mable Kuklinski as follows: "She was one of the leaders of the walkout in the first instance, and evidently the leader of the total concerted activity."

3. The respondent contends that it was merely adopting a new policy against hiring relatives. The Board rejected this contention for it found that both Ethel Micek and her sister had been recalled.

4. Ethel Micek, a witness for the General Counsel, testified that there were four or five new girls on the job on Monday. The record does not disclose whether any of them came to work on Friday, December 3, 1963.

The respondent received the letter before work began on Tuesday, but did not immediately reply.

The union business agent visited the plant on Tuesday and asked the Company president to reinstate the strikers and discuss employee grievances. The president stated he was willing to meet, but would first have to talk with his attorney. He made no further contact with the union representative on Tuesday. On Wednesday morning, the union representative returned to the plant accompanied by the ten remaining strikers and asked that they be reinstated. The president said that their jobs had already been filled.

In summary, at least four new employees had been hired by Monday morning, and all positions formerly held by the complainants were filled by Wednesday morning.

The ten employees, denied reinstatement on December 18, 1963, filed charges and amended charges with the National Labor Relations Board on January 16, 1964, and February 27, 1964, respectively. The General Counsel issued a complaint alleging a violation of Sections 8 (a) (1) and (3) of the Act on March 13, 1964.

On March 3, 1964, the respondent offered to reinstate the ten remaining strikers to their old jobs under the same working conditions as existed prior to their December 12 walkout. They all reported to work on March 9, 1964, as requested.

█ The employees were dissatisfied with the employment conditions after returning to work, and eight of them struck for a second time one hour before quitting time on March 26, 1964. The next day, the respondent notified the

strikers that they were being given a "one week disciplinary layoff" for their behavior. They, in turn, sent a wire to the respondent offering to return to work if they could do so under their original job conditions. The respondent then advised them to return to work at 8:00 a. m., April 3. They complied with the request.

The National Labor Relations Board found: (1) The strike, which began on December 12, 1963, was a protected economic strike precipitated by the discharge of Max Lucore. It took on an added cause with various other grievances. (2) The respondent's rejection, on December 18, of the complainants' application for reinstatement violated Sections 8(a) (1) and (3) of the National Labor Relations Act. (3) The respondent refused to reinstate the complainants not because it deemed them permanently replaced but because it feared that they would organize and cause another strike. (4) The record failed to show that complainants' jobs had been permanently filled prior to application for reinstatement.

Replacement did not constitute a defense to the refusal to reinstate because the strike had been converted into an unfair labor practice strike by respondent's intervening violations of the Act, namely: (1) offering Mable Kuklinski's job to Ethel Micek as an inducement to abandon the strike in violation of Sections 8(a) (1) and (3), and (2) stating that it would not meet with strikers because their jobs had been filled constituted a constructive discharge.[5]

The Board further found that the respondent violated Sections 8(a) (1) and (3) by: (1) discriminating with regard to the complainants' employment conditions when it rehired them in March,

5. This finding is not sustained by substantial evidence. It is clear that when this conversation took place, the employees were still insisting that their grievances, including the reinstatement of Max Lucore, be resolved before they returned to work. The fact that the respondent may not have been telling the truth, when he said all jobs had been filled, is not a basis

for a finding that the statement was an unfair labor practice. Whether the statement created the impression that it was futile for them to seek reinstatement is immaterial in view of our holding that the offer of Mable Kuklinski's job to Ethel Micek was a violation of Sections 8(a) (1) and (3) of the Act.

1964, and (2) by imposing a one-week layoff on eight of the complainants when they again struck to protest the imposition of the discriminatory working conditions and by threatening to discharge the employees if they struck again.

## THE DECEMBER 12TH STRIKE

The respondent's principal argument before the Board in connection with the December 12th strike was that no labor dispute existed within the meaning of the Act, and thus concerted activity to protest the discharge of the supervisory employee was unprotected. The respondent, urged, in the alternative, that if the employees had a right to engage in the concerted activity, the means selected (a strike) was unreasonable. The Board rejected both contentions.[6]

The respondent does not here question the Board's decision that the employees' strike of December 12 was a protected activity,[7] or its decision that the activity was reasonable. However, it is contended that: (1) the employees' status as economic strikers was not changed to that of unfair labor practice strikers by any subsequent act of the respondent, and (2) the employees were economic strikers who had been permanently replaced when they sought to return to work.

We reject the respondent's first contention. The economic strike of December 12 was converted to an unfair labor practice strike on December 14 when the respondent offered Ethel Micek a thirty-cent hourly increase to take over Mable Kuklinski's job.[8] This offer constituted a violation of Section 8(a) (1) of the National Labor Relations Act. N. L. R. B. v. Fotochrome, Inc., 343 F.2d 631 (2d Cir. 1965); N. L. R. B. v. Philamon Laboratories, Inc., 298 F.2d 176 (2d Cir. 1961).

In *N. L. R. B. v. Fotochrome, Inc.,* supra, the Court held that it was a violation of Section 8(a) (1) for an employer to offer an employee, picketing his place of business, a $35.00 weekly raise in pay if the employee would return to work.

In *N. L. R. B. v. Philamon Laboratories, Inc.,* supra, the Circuit Court held that an employer's promises of benefits to employees designed to induce disaffection from the union was in violation of Section 8(a) (1). At page 181 of the decision, the Court states:

> "The clear implication of the timing and context of these events was that the employees would receive the promised benefits if they abandoned the union."

---

6. The Board stated:
   "It is therefore clear that the determination of whether a 'labor dispute' exists does not depend on the *manner* in which the employees choose to press the dispute, but rather on the *matter* they are protesting. Where a 'labor dispute' exists, the employees may engage in a peaceful primary strike or any other lawful manner of protest and still retain the protection of the Act.
   "In sum, we find, as did the Trial Examiner, that the discharge of Lucore had an impact on the strikers in the performance of their jobs and was therefore within the realm of their proper concern. They were thus free to act as they did to protest the discharge. There is nothing in the record of this case to show that their peaceful strike fell within any category which would make it unprotected. We accordingly find that the strike was

protected by the Act. We do not adopt the Dobbs Houses standard of 'reasonableness' as declared by the Fifth Circuit, but even if we deemed that standard to be applicable, we would nevertheless find on the facts of this case, for the reasons set out above, that the employees were reasonable in finally striking when they did."

7. The respondent stated in its Brief:
   "The evidence requires a finding that the walk-out was an economic strike, a protected activity, which continued to and through the uncontradicted replacement of certain of those employees who voluntarily left the employment as the jobs were filled on a first come—first serve basis."

8. Ethel Micek's incompetence for the job is indicated by the fact that she was demoted a short time after being rehired.

The respondent's motives for recalling Micek are further indicated by the duties given her when she resumed employment. She was initially called upon to indicate the names of Kuklinski's relatives, none of whom were to be recalled. Then she was asked to indicate other employees who she felt ought not to be recalled. Finally, she was given the task of calling the "approved" strikers back to work.

■ Thus, what began as an economic strike was converted to an unfair labor practice strike, on Saturday December 14, when Ethel Micek was offered Mable Kuklinski's job as an inducement to return to work. Those complainants whose jobs had not been filled before the commission of the unfair labor practice were entitled to reinstatement. N. L. R. B. v. Pecheur Lozenge Co., 209 F.2d 393 (2d Cir.1953). The Court, in Pecheur Lozenge Co., at pages 404–405, stated:

" * * * The strike, which began as an economic strike on December 2, 1949, was converted into an unfair labor practice strike on December 7, 1949, when the Company unlawfully refused to bargain with the Union and conditioned resumption of negotiations upon abandonment of the strike. N. L. R. B. v. Remington Rand, Inc., supra [2 Cir., 130 F.2d 919]; Black Diamond Steamship Corp. v. N. L. R. B., supra [2 Cir., 94 F.2d 875]; N. L. R. B. v. Remington Rand, Inc., 2 Cir., 94 F.2d 862, certiorari denied, 304 U.S. 576, 58 S.Ct. 1046, 82 L.Ed. 1540; N. L. R. B. v. St. [Mary's Sewer Pipe Co.] [3 Cir., 146 F.2d 995.] supra; Ritzwoller Co. v. N. L. R. B., 7 Cir., 114 F.2d [Cir.,] [432; N. L. R. B. v. Lettie Lee, Inc., 9 Cir., 140 F.2d 243.] The strikers, therefore, became unfair labor practice strikers, and the Company was obligated to reinstate them when they unconditionally applied for reinstatement on April 6, 1950, discharging if necessary all replacements hired after December 7, 1949, to take the place of strikers during the strike. N. L. R. B. v. Remington Rand, Inc., supra (both cases); Black Diamond S.S. Corp. v. N. L. R. B., supra. * * * "

The remaining question to be answered is whether the respondent had employed any new workers before Saturday, December 14th?

■ While we concur with the Board's holding that the respondent has the burden of establishing that employment was not available to striking employees on the ground that their positions had been permanently filled with replacements, N. L. R. B. v. Brown & Root, Inc., 311 F.2d 447, 454 (8th Cir. 1963); Snow v. N. L. R. B., 308 F.2d 687, 695 (9th Cir. 1962); N. L. R. B. v. Cambria Clay Prod. Co., 215 F.2d 48, 56 (6th Cir. 1954); N. L. R. B. v. J. G. Boswell Co., 136 F.2d 585, 597 (9th Cir. 1943), the record is clear that four and possibly five workers were employed as of the beginning of work, Monday, December 16. The record is too fragmentary for us to make a determination as to whether any of them were employed before the commission of the unfair labor practice on December 14. This issue must be determined by the Board in a Compliance hearing with the burden of proof resting with the respondent to show he had hired replacements for the complainants before its violation.

■ It is abundantly clear from the record, however, that Mable Kuklinski is entitled to reinstatement as of December 18. It was her position that was filled by Ethel Micek and she is entitled to be reinstated to said position and awarded back pay in accordance with established practices of the Board.

## THE RETURN TO WORK ON MARCH 9 AND THE SECOND STRIKE ON MARCH 26

The Board's finding that the respondent violated Sections 8(a) (1) and (3) of the Act by (a) discriminating with regard to working conditions with respect to complainants after their return to work on March 9, 1964, and (b) by imposing a disciplinary layoff when they struck to protest the discriminatory working conditions is supported by substantial evidence on the record as a whole.

*Discrimination with regard to working conditions.* When complainants returned to work on March 9, they found their new working conditions to be far different from those existing prior to the strike and different from those under which the respondent's other employees worked. They were subject to a series of new rules which severely limited the freedom that they had been accustomed to before December 12. For example, they had to leave the factory by a rear door, while other employees were permitted to use the front door. They were prohibited from going into the front part of the plant for any reason. While they were no longer permitted to eat lunch at their work tables, the Company did not provide a suitable eating place for them. Work breaks were reduced from fifteen to ten minutes, and the new factory supervisor refused to relieve an employee who needed to leave a machine during working hours.

The Board found that these conditions were imposed to punish the complainants for their concerted activities and to minimize the possibility of their organizing the remaining employees. Viewing the record as a whole, the Board's finding is sustained by substantial evidence. We agree that the respondent violated Sections 8(a) (1) and (3) of the Act by discriminating against the returning strikers with regard to their terms and conditions of employment. Radio Officers' Union, etc. v. N. L. R. B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1953).

*One-week layoff for striking.* Shortly after complainants returned to work, the union, upon their request, protested the discriminatory working conditions to the respondent in writing. The protest, however, went unheeded. On March 25, the complainants decided to strike and the next day left the plant a half hour before quitting time. On March 27, the respondent notified the strikers that they were suspended without pay for one week because they left work "without giving notice or reason to the supervisor." The complainants immediately replied, stating they would return to work if the respondent would keep the promises made to them in their reinstatement offer on March 3. The respondent answered, saying that they could have their old jobs back under the same working conditions that existed prior to December 12, but that they should not report back for work until April 3. When they reported to work on April 3, they were told that the "next time (they walked off) was going to be it.—They weren't going to be taken back."

The Board found that the March 26 strike was for the purpose of obtaining better working conditions and, therefore, was a protected concerted activity. It concluded that the respondent violated the Act by the one-week layoff.

The respondent argues here that the layoff was clearly lawful, and that the Board erred in finding: (1) that the layoff was an unfair labor practice, and (2) that the employees were entitled to be compensated for the time lost as a result of the layoff.

The Board's decision has support in N. L. R. B. v. Washington Aluminum Co., 370 U.S. 9, 82 S.Ct. 1099, 8 L.Ed.2d 298 (1962). There a group of employees struck protesting that their work shop was too cold. They were discharged for striking. The Board found the discharge to be a violation of Section 8(a) (1) of the Act and ordered the employees reinstated with back pay. The Circuit Court of Appeals denied enforcement on the grounds that the workers simply "summarily left their place of employment" without affording the company an "opportunity to avoid the work stoppage by granting a concession to a demand," their walkout not amounting to a concerted activity protected by Section 7 of the Act. N. L. R. B. v. Washington Aluminum Co., 291 F.2d 869, 877 (4th Cir. 1961). The Court of Appeals further found that the Board had exceeded its power in issuing the order involved because Section 10(c) declares that the Board shall not require reinstatement or back pay for an employee suspended or discharged "for cause." *Ibid.*

The Supreme Court, in reversing the Court of Appeals, at pages 14, 16 of 370 U.S., page 1102 of 82 S.Ct., stated:

"We cannot agree that employees necessarily lose their right to engage in concerted activities under § 7 merely because they do not present a specific demand upon their employer to remedy a condition they find objectionable. * * *

* * * * * *

" * * * The fact that the company was already making every effort to repair the furnace and bring heat into the shop that morning does not change the nature of the controversy that caused the walkout. At the very most, that fact might tend to indicate that the conduct of the men in leaving was unnecessary and unwise, and it has long been settled that the reasonableness of workers' decisions to engage in concerted activity is irrelevant to the determination of whether a labor dispute exists or not. * * *

"Nor can we accept the company's contention that because it admittedly had an established plant rule which forbade employees to leave their work without permission of the foreman, there was justifiable 'cause' for discharging these employees, wholly seprate and apart from any concerted activities in which they engaged in protest against the poorly heated plant. Section 10(c) of the Act does authorize an employer to discharge employees for 'cause' and our cases have long recognized this right on the part of an employer. But this, of course, cannot mean that an employer is at liberty to punish a man by discharging him for engaging in concerted activities which § 7 of the Act protects. And the plant rule in question here purports to permit the company to do just that for it would prohibit even the most plainly protected kinds of concerted work stoppages until and unless the permission of the company's foreman was obtained." See N. L. R. B. v. Comfort, Inc., 365 F.2d 867 (8th Cir. 1966); N. L. R. B. v. Solo Cup Co., 237 F.2d 521, 525-526 (8th Cir. 1956).

In summary, we sustain the findings of fact and conclusions of law as found by the Trial Examiner and adopted by the National Labor Relations Board except as follows:

(1) The finding that respondent violated Sections 8(a) (1) and (3) by representing to them that their jobs had been filled by newly hired employees.

(2) The finding that the positions of the nine striking employees other than Mable Kuklinski had not been filled by permanent replacements on December 14, 1963, the date the strike was converted from an economic to an unfair labor practice strike. A determination of whether any of these positions were so filled before said date shall be made in the Compliance Hearing at which the burden of proof will be on the respondent.

(3) Mable Kuklinski is entitled to be reinstated and made whole for losses in pay sustained as a consequence of the failure to reinstate her to the position she held prior to December 12, 1963, as of the date of her request for reinstatement, December 18, 1963.

The petition of the Board will be granted for the enforcement of its order except insofar as this opinion requires the order and its appendix to be modified to conform herewith.