326 F.2d 634
 DAYTON TYPOGRAPHICAL UNION NO. 57 (International Typographical Union, AFL-CIO), and International Typographical Union (AFL-CIO), Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 17058.
 United States Court of Appeals District of Columbia Circuit.
 Argued March 14, 1963.
 Decided November 14, 1963.
 
 Mr. George Kaufmann, Washington, D. C., with whom Messrs. Gerhard P. Van Arkel, Washington, D. C., and Robert A. Wilson, Cincinnati, Ohio, were on the brief, for petitioners.
 Mr. Norton J. Come, Asst. Gen. Counsel, N. L. R. B., with whom Messrs. Stuart Rothman, Gen. Counsel at the time the brief was filed, Dominick L. Manoli, Associate Gen. Counsel, and Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent.
 Before FAHY, WASHINGTON and DANAHER, Circuit Judges.
 WASHINGTON, Circuit Judge.
 
 
 1
 This case raises novel questions concerning the proper construction and application of Section 8(b) (7) (C) of the National Labor Relations Act, 29 U.S.C. § 158(b) (7) (C) (Supp. IV, 1959-62), added by Section 704(c) of the Labor-Management Reporting and Disclosure Act of 1959, 73 Stat. 519, 544 (sometimes referred to as the Landrum-Griffin Act). That section provides, in relevant part, that it is an unfair labor practice for a labor organization:
 
 
 2
 "(7) to picket or cause to be picketed * * * any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees * * * unless such labor organization is currently certified as the representative of such employees:
 
 
 3
 * * * * * *
 
 
 4
 "(C) where such picketing has been conducted without a petition under section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing * * *."
 
 
 5
 The Greenfield Printing and Publishing Company, the employer, conducts its business in Greenfield, Ohio. Early in 1959, some of its employees became interested in union organization. They contacted the president of Dayton Typographical Union No. 57, a local of the International Typographical Union, and began signing cards authorizing that Union to represent them. By March 20, 1959, 35 of the 51 employees, exclusive of office and clerical staff, had signed cards. By letter of that date and orally, the Union officials advised the Company's president that the Union represented a substantial majority of the Company's employees, and requested recognition and a meeting for the purpose of negotiating a contract. The Union also advised that it was not in compliance with Section 9 (f), (g), and (h) of the Act, and could not petition for a Board-conducted election to prove its majority status,[1] but that it was willing to submit to an election conducted by any reputable local citizen of the Company's choice. The Company "refused these requests" orally. By letter dated March 27, 1959, it stated that it would not recognize or bargain with the Union, pending a determination by the Board of the Union's majority status under the petition for an election filed by the Company on March 26. Thereupon, a majority (31) of the employees voted to strike. Work ceased on April 15, 1959, and peaceful picketing of the Company's plant commenced. Notwithstanding the strike and picketing then in progress a hearing on the Company's petition was held and an election was directed by the Board on May 18, 1959. Two days later the Company asked leave to withdraw its petition. The request was not opposed by the Union and was granted by the Board on June 4, 1959.
 
 
 6
 The picketing continued until May 23, 1960, when it was enjoined. From time to time during the picketing leaflets were distributed by the pickets indicating, as the Board found, that they were on strike and picketing for the purposes of forcing the Company to recognize the Union and to bargain collectively with the Union on their behalf.
 
 
 7
 By virtue of Section 201(d) of the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin), 73 Stat. 519, 525, the disabilities that had previously prevented the Typographical Union from petitioning for a Board election were removed as of September 14, 1959. The Union did not thereafter, "within a reasonable time" or otherwise, petition for representation or file an unfair labor practice charge against the Company. It nevertheless continued to picket. Section 8(b) (7) of the Act became effective on November 13, 1959. On April 19, 1960, more than five months later, the Company filed charges against the Union under Section 8(b) (7) (C). The Board found that the Union had picketed unlawfully in violation of that section for the reasons given in the Blinne Construction Company case, International Hod Carriers Building, Etc. Local 840, 135 N.L.R.B. 1153 (1962). The Union petitions us to overturn that determination, arguing in essence that the 1959 amendments worked no changes which must be noticed here. We find ourselves unable to accept the Union's view.
 
 I.
 
 8
 We consider first whether Section 8(b) (7) (C) prohibits picketing for recognition by a union beyond the 30-day period prescribed (assuming that a petition for representation has not been filed under Section 9(c)), where the union has not been certified but holds authorization cards signed by a majority of the employees.[2]
 
 
 9
 The Union contends that picketing under such circumstances is not forbidden, basing its argument on evidence in the legislative history that the evil which prompted Congress to include the section was "blackmail" picketing by a union not lawfully entitled to recognition as representing a majority of the employees. It is indisputable that this was the evil with which Congress was predominantly concerned. It is equally beyond argument, on the other hand, that the clear language of the statute, as it was ultimately enacted, which exempts from its operation only a "labor organization [that] is currently certified," goes far beyond mere correction of that evil.[3] It negates a view that a union, merely by virtue of its majority status, but without the filing of a petition or having current certification, can picket for recognition beyond the thirty-day period fixed without incurring sanctions. Our construction not only appears to be required by the language used but it effectuates the apparent purpose of Section 8(b) (7), subject to the limitations and provisos therein expressed, "to encourage prompt resort to the election machinery, rather than protracted picketing, as the method for resolving representation questions." Meltzer, Organizational Picketing and the NLRB, 30 Univ. Chi.L.Rev. 78, 83 (1962).
 
 
 10
 We accept the reasoning of the Board in the Blinne-International Hod Carriers case,[4] supra at 1162:
 
 
 11
 "* * * Yet it cannot be gainsaid that Section 8(b) (7) by its explicit language exempts only `currently certified' unions from its proscriptions. Cautious as we should be to avoid a mechanical reading of statutory terms in involved legislative enactments, it is difficult to avoid giving the quoted words, essentially words of art, their natural construction. Moreover, such a construction is consonant with the underlying statutory scheme which is to resolve disputed issues of majority status, whenever possible, by the machinery of a Board election. Absent unfair labor practices or pre-election misconduct warranting the setting aside of the election, majority unions will presumably not be prejudiced by such resolution. On the other hand, the admitted difficulties of determining majority status without such an election are obviated by this construction."
 
 
 12
 See also Greene v. International Typographical Union, 182 F.Supp. 788, 790-792 (D.Conn.1960), which had arrived at the same conclusion some two years earlier.
 
 
 13
 Moreover, although we find no ambiguity in the statutory language in this respect, we may note that the legislative history demonstrates that Congress intended this result.
 
 
 14
 Both S. 1555, the bill that originally passed the Senate, and H.R. 8342, the version favorably reported by the House Committee on Education and Labor, would have added to Section 8(b) a new subsection (7) [subsection (8) in the House bill], proscribing recognitional picketing unless the labor organization had been certified "or unless such labor organization has been designated or selected as a representative for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes."[5] See I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (hereafter referred to as "Legis. Hist.") at 584, 757. The provision was however omitted from the Section 8(b) (7) version contained in the Landrum-Griffin substitute bill as referred (H.R. 8490), see I Legis.Hist. at 932-33, and as
 
 
 15
 S. 1555 and the House bill then were referred to a Conference Committee. it passed the House, see 105 Cong.Rec. 15882, 15890, 15892 (1959), II Legis. Hist. 1693, 1700, 1702.
 
 
 16
 After the conferees had been meeting for ten days and had reached an impasse as to certain disputed matters (105 Cong. Rec. 17325, 17327; II Legis.Hist. 1375, 1377), four of the seven Senate conferees (105 Cong.Rec. 15965, II Legis.Hist. 1351) presented Senate Resolution 181 to the Senate on August 28, 1959,[6] which if adopted would have instructed the Senate conferees "to insist on the inclusion in the conference agreement of the following provisions." 105 Cong.Rec. 17332, II Legis.Hist. 1382. The language in S. 1555, set out above, which would have permitted picketing by unions representing a majority of the employees, even though not certified, was not included among those provisions. As stated by Senator (now President) Kennedy, the chairman of the Conference, presentation of the resolution followed efforts to reach an agreement in conference on Title 7 (containing the new Section 8(b) (7)), during which the Democratic Senate conferees:
 
 
 17
 "made what I consider to be far-reaching proposals, going far beyond the bill which passed the Senate. We did so in an effort to meet the House conferees more than half way. I personally am not prepared, however, to accept the Landrum-Griffin bill in its entirety, without receiving instructions from the Senate.
 
 
 18
 * * * * * *
 
 
 19
 "Finally, we accept the limitations on organizational picketing proposed in the House amendment. Organizational picketing in our substitute [the resolution] is closely restricted, with three qualifications which are fair and reasonable." 105 Cong.Rec. 17327, II Legis.Hist. 1377.
 
 
 20
 The three "fair and reasonable" "qualifications" as set out in the proposed resolution and as explained by Senator Kennedy (see 105 Cong.Rec. 17327, II Legis.Hist. 1377) do not suggest that a non-certified union actually representing a majority will be exempt from the picketing ban.[7]
 
 
 21
 It is thus apparent that the House conferees were firm in rejecting the provision in S. 1555, quoted above, which would have exempted from the picketing ban both certified unions and unions representing a majority of the employees; and that the requirement for current certification, even where a union actually represents a majority of the employees, was one of the "limitations" which had been accepted by the Senate Democratic conferees in conference prior to presentation of the resolution.
 
 
 22
 We think it clear that Section 8(b) (7), as reported by the Conference and as enacted by Congress, reflects a conscious and intentional acceptance by the Senate conferees — and by Congress — of the House-sponsored requirement for current certification of a union, and a conscious and intentional abandonment by the Senate conferees — and by Congress — of the Senate-sponsored provision which would have exempted unions having majority status, even though not certified, from the ban on picketing imposed by Section 8(b) (7). Cf. Mastro Plastics Corp. v. National Labor Relations Board, 350 U.S. 270 at 288-289, 76 S.Ct. 349 at 360-361, 100 L.Ed. 309 (1956), and National Labor Relations Board v. Drivers Local Union, 362 U.S. 274, 288-289, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960). In the circumstances, we are unable to read into the statute, contrary to its actual language and the legislative intent, an exemption for non-complying uncertified unions representing a majority of the employees.[8]
 
 
 23
 The Union suggests also that the picketing here should not be treated as having as one of its objects "forcing or requiring" the employer to recognize the Union when the employer was already required by Sections 8(a) (5) and 9 (a) of the Act to recognize a majority union. However, before the picketing commenced the employer had refused to carry out its statutory obligation, assuming for present purposes that the obligation was fully established. In such circumstances the peaceful picketing, accompanied by the distribution of leaflets which attacked the employer's refusal to recognize and bargain with the Union, necessarily had as an objective "requiring," if not "forcing," the employer to meet its asserted legal obligation. The Trial Examiner indeed found that the picketing was "for the purposes of forcing the Company to recognize the Union and to bargain collectively" with it. The Board adopted the finding.
 
 
 24
 True, in National Labor Relations Board v. Drivers Local Union, supra, the Supreme Court held that the words "to restrain or coerce" in Section 8(b) (1) (A) of the Act do not apply to peaceful picketing not involving "violence, intimidation, and reprisal or threats thereof." 362 U.S. at 290, 80 S.Ct. at 715, 4 L.Ed. 2d 710.
 
 
 25
 It by no means follows, however, that the words "forcing or requiring" in the new Section 8(b) (7) are to be construed as not applicable to peaceful picketing.[9] The Second Circuit in National Labor Relations Board v. Local 239, International Brotherhood of Teamsters, 289 F.2d 41 (2d Cir. 1961), cert. denied, 368 U.S. 833, 82 S.Ct. 58, 7 L.Ed.2d 35 (1961), declined so to construe those words. There are important structural differences between the two sections. Section 8(b) (1) (A), 29 U.S.C. § 158 (b) (1) (A) (1958), does not use the word "picketing" at all: it declares that it shall be an unfair labor practice for a labor organization "to restrain or coerce (A) employees in the exercise of the rights" guaranteed in Section 7. The clear implication is that only an actual restraint or coercion of some kind is proscribed, not the passive attempt to influence involved in peaceful picketing — as we and the Supreme Court held. In contrast, Section 8(b) (7) refers in terms to picketing which has an object of "forcing or requiring" an employer to recognize an uncertified union. Unlike Section 8(b) (1), it is the purpose of the picketing, rather than the means used, which is decisive. It is hardly debatable that an object or aim of peaceful recognitional picketing must be to "require," if not to force, the employer to recognize the union.[10] To quote the language used in the "Section-by-Section Analysis of the Labor-Management Reporting and Disclosure Act of 1959," prepared for use of the Senate Committee on Labor and Public Welfare, 86th Cong., 1st Sess., printed on September 10, 1959 (after the Act had been passed by both Houses), at page 20, I Legis.Hist. 966:
 
 
 26
 "This section [Section 8(b) (7)] makes it an unfair labor practice for a union to picket, or threaten to picket, where an object is to gain recognition or promote organization of the employees under three circumstances:" (Emphasis added.)
 
 
 27
 Violence or active coercion as an essential element of the picketing seems definitely ruled out by such language.[11]
 
 II.
 
 28
 We turn now to the contention that the Union may not be found to have committed the unfair labor practice described by Section 8(b) (7) of the Act, where the picketing was not only for the purpose of recognition, but also to protest unfair labor practices of the employer alleged to be in violation of Section 8(a) (1) and (5) of the Act.[12]
 
 
 29
 The Union has not charged the employer with unfair labor practices under Section 8(a) (1) and (5), and no finding that it was guilty of such practices has been made.[13] We will, however, assume for present purposes that the Company has engaged in the unfair practices described in Section 8(a) (1) and (5).
 
 
 30
 It is clear that prior to the 1959 Act a union could lawfully picket to protest an unfair labor practice of the employer. Mastro Plastics v. National Labor Relations Board, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956); United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941 (1956). The question we have here is whether the 1959 Act — and in particular Section 8(b) (7) — circumscribes or qualifies that right in cases where another aim or object of the picketing is recognition or organization. We must look both at the Act itself and the legislative materials at hand.
 
 
 31
 The 1959 Act not only added Section 8(b) (7). It also amended Section 10(l) of the National Labor Relations Act[14] to provide that where a Section 8(b) (7) charge has been filed, a restraining order against the labor organization shall not be applied for if a well-founded charge has been filed against the employer under Section 8(a) (2). The latter section provides that it is an unfair labor practice for an employer to "dominate or interfere with the formation or administration of any labor organization or contribute financial or other support to it."[15] The legislative history relating to this amendment is pertinent and illuminating with regard to the problem now before us.
 
 
 32
 S. 1555 as passed by the Senate, and H.R. 8342 as reported to the House, both contained a provision which would have amended Section 10(l) of the Act to read as follows:
 
 
 33
 "* * * where a charge is filed under section 8(b) (7) [8(b) (8) in the House bill] it shall be a defense to show that an unfair labor practice within the meaning of section 8(a) has been committed. * * *" I Legis.Hist. 584, 757-58.
 
 
 34
 Had this provision been enacted, any unfair labor practice of the employer under Section 8(a), including those under Section 8(a) (1) and (5), would of course have exonerated the Union from any violation of Section 8(b) (7). The provision was however omitted from the Landrum-Griffin version of the bill (H.R. 8490) as introduced and as it passed the House. See I Legis.Hist. 932-33; II Legis.Hist. 1700.
 
 
 35
 We have already referred to the fact that after the Conference Committee, to which S. 1555 and the House bill were referred, had met for ten days and had been unable to agree as to certain provisions urged by some of the conferees, four of the Senate conferees presented on the Senate floor Senate Resolution 181, which, if it had been adopted, would have instructed the Senate conferees "to insist on the inclusion in the conference agreement of the following provisions." One of the provisions set out in the resolution was the following (105 Cong.Rec. 17333, II Legis.Hist. 1383):
 
 
 36
 "(d) Section 10(l) of the National Labor Relations Act, as amended, is amended by adding after the words `section 8(b),' the words `or section 8(e) or section 8(b) (7),' and by striking out the period at the end of the third sentence and adding the following:
 
 
 37
 "`Provided further, That where a charge is filed under section 8(b) (7) it shall be a defense both to the application for a temporary restraining order and to any complaint issued under section 10(b) to show that an unfair labor practice within the meaning of section 8(a) has been committed by the employer.'"
 
 
 38
 The analyses accompanying the resolution and presented with it stated (105 Cong.Rec. 17334, II Legis.Hist. 1384):
 
 
 39
 "Third. Organizational picketing is closely restricted with three qualifications which are fair and reasonable:
 
 
 40
 * * * * * *
 
 
 41
 "3. A union would be allowed to picket an employer who has committed unfair labor practices. This exception respects the equities in a picketing situation and protects workers against unfair employer tactics."
 
 
 42
 As already indicated above, at footnote 6, the resolution was not acted on in the Senate before the Conference reached agreement on the final bill and presented its report to both Houses of Congress.
 
 
 43
 However, the Conference bill as reported and as enacted did not contain the amendment to Section 10(l) set out in the resolution, but did contain as an amendment to Section 10(l) the modified proviso which appears in footnote 14, supra. It is obvious that, notwithstanding the reluctance of Senator Kennedy to make further concessions "without receiving instructions from the Senate" (see supra) the four Senate conferees did accept the elimination of the provision set out in their resolution and did, except for Senator Morse (who declined to sign the report), agree to the version reported to and enacted by Congress.[16]
 
 
 44
 Thus, although the proposed amendment to Section 10(l), as contained in the original Senate bill and in the resolution submitted by the four Senate conferees shortly before agreement was reached in conference, was not rejected entirely, it was substantially watered down in the final enactment.[17] Instead of making any unfair labor practice of the employer a complete defense to an 8(b) (7) charge as in S. 1555 — or a complete defense to an application for a temporary restraining order under Section 10(l) and a complete defense to a complaint under Section 10 (b) as in the proposed Senate resolution — the provision enacted emerged only as a ban against application under Section 8 (b) (7) for a restraining order if an 8(a) (2) charge against the employer had been filed and found meritorious. We can only conclude that the Conference and the Congress considered and deliberately abandoned the thought of making every employer unfair labor practice a blanket defense to an 8(b) (7) charge. In such circumstances, we cannot construe the enactment as intended to have that effect.
 
 
 45
 The Union urges that a different conclusion is required because of the words of Senator Morse that "The House conferees insisted that a picket line protesting unfair labor practices would not be a violation of the anti-picketing provisions of their bill." We cannot agree. Whatever the House conferees may have insisted on, "their bill" was not the version finally enacted. It is quite possible also that the House conferees were thinking only of picketing which did not have a recognitional objective. (We have quoted Senator Morse's entire statement on this point in footnote 17, supra.) In any case, it is plain that Senator Morse was not persuaded that Section 8(b) (7) would permit unfair labor practice picketing, unless the right to do so was expressly reserved. See footnote 17, supra. Senator Goldwater, another of the Senate conferees, seems also to have shared this view.[18] And the House conferees did agree to the inclusion of the watered down version of the proviso finally enacted — which would have been entirely unnecessary if recognitional picketing, also protesting unfair labor practices, was not subject to the ban of Section 8(b) (7).
 
 
 46
 Finally, if the House conferees did actually think that the House bill permitted unfair practice picketing, as reported by Senator Morse, that view appears not to have survived with respect to the Conference bill. When the Conference bill was before the House, after having been passed by the Senate, Representative Griffin, one of the House conferees, submitted to the House a "preliminary report" on the Conference agreement indicating "the nature of the settlement reached on the important points of difference" between the House and Senate bills, the material part of which follows (105 Cong.Rec. 18021-22, II Legis.Hist. 1712-13).
 
 
 47
 -----------------------------------------------------------------------------------------------
 | House bill | Senate bill | Conference
 | (Landrum-Griffin) | (Kennedy-Ervin) | agreement
 -------------------|-------------------------|--------------------------|----------------------
 * * * | * * * | * * * | * * *
 IV. Organizational | | |
 picketing .. | | |
 | 5. Provides for | Discretionary injunction | Mandatory injunction;
 | enforcement | by NLRB. | no damage
 | mandatory injunction | Union could delay | suit; union can
 | obtained | issuance of injunction | charge unfair
 | through | and continue | practices but cannot
 | NLRB, and/or | picketing by charging | block injunction
 | suit for damages. | employer with | except in limited
 | | unfair labor practices. | situations under
 | | | sec. 8 (a) (2).
 | | | (Emphasis added.)
 | | |
 
 
 48
 This interpretation by one of the leading House participants in drafting the bill, and a House conferee, precludes a view that the intention was to preserve the right to picket to protest all unfair practices, rather than only with respect to the "limited situations under sec. 8(a) (2)."[19] Furthermore, a statement of Representative Thompson, another one of the House conferees, on the floor of the House is in accord. He said (105 Cong.Rec. 18133, II Legis.Hist. 1720):
 
 
 49
 "The joint conferees adopted not less than 75 amendments to the House-passed bill. These amendments represent a return to the original committee, or Elliott, bill. * * *
 
 
 50
 "Following are 15 of the most important improvements made by the conferees to the Landrum-Griffin bill:
 
 
 51
 * * * * *
 
 
 52
 "6. Defense to picketing: Although the conference agreement contains a prohibition upon picketing an employer who has a contract with another union, language was added to the House bill which would make it a defense to show that the General Counsel had issued a complaint charging the employer with unlawfully dominating, maintaining, or assisting the other union." [A Section 8(a) (2) charge]
 
 
 53
 It is certainly to be supposed that if any of the House conferees were of the view that any other employer unfair labor practice was a defense against, or would remove, the ban imposed by Section 8(b) (7) on organizational or recognitional picketing, some statement to that effect would have been made. None has been cited to us nor has our research disclosed any. We are unable to conclude that the House conferees conceded in conference that unfair practice picketing could lawfully continue beyond the 30-day period fixed by Section 8(b) (7) if such picketing also had an organizational or recognitional objective, or that either the Senate or the House intended that such picketing would be permitted under the 1959 Act.
 
 
 54
 We read National Labor Relations Board v. Drivers Local Union, 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710 (1960), as directly supporting our conclusion here. In that case, as well as in Mastro Plastics Corp. v. National Labor Relations Board, 350 U.S. 270, 76 S.Ct. 349, 100 L.Ed. 309 (1956), the Supreme Court took into account the Act as a whole, its purposes and policies, and, finding that the particular statutory provision before it was not entirely clear, it looked to the legislative history to determine what was the congressional intention. Drivers Union involved a legislative situation substantially similar to that here: there, unlike the position taken by the Senate, the House view "was that picketing should be strictly circumscribed" but "the House conferees abandoned the House bill in conference and accepted the Senate proposal." 362 U.S. at 288, 289, 80 S.Ct. at 714, 715, 4 L.Ed.2d 710. The Supreme Court concluded in this posture that Section 8(b) (1) (A) as enacted was not intended to circumscribe picketing in the manner originally put forward by the House but abandoned in conference,[20] and that the words "to restrain or coerce" used in the section did not apply to peaceful picketing to compel immediate recognition but only to "union tactics involving violence, intimidation, and reprisal or threats thereof." 362 U.S. at 290, 80 S.Ct. at 715, 4 L.Ed.2d 710. Conversely, in our case the House view prevailed, and the Senate provision which would have exempted unfair practice picketing from the limited ban imposed by Section 8(b) (7) was abandoned in conference and was not enacted. We are not free to write in such an exemption, contrary to the congressional decision not to include it, no matter how desirable we ourselves might think such a result would be.
 
 
 55
 The congressional intent, in our view, is clear. Questions of constitutionality and enforcement will be considered in Part IV of this opinion.
 
 III.
 
 56
 We now turn to the question whether the filing of a petition for an election by the employer, and its withdrawal prior to the date Section 8(b) (7) became effective, is a sufficient filing for purposes of that section.
 
 
 57
 As we have noted, the employer in the present case filed a representation petition with the Board on March 26, 1959, about three weeks before the Union began to picket. In May, after the picketing had started, the employer asked leave to withdraw the petition. The Union did not oppose this request, and the Board granted it. Some five months later, in November of 1959, Section 8(b) (7) became effective. The Union urges that under these circumstances its continued picketing did not violate that section. We must disagree.
 
 
 58
 The purpose of Congress in passing Section 8(b) (7) — the encouragement of elections under the aegis of the Board — was not satisfied by the action of the employer here in filing and then withdrawing an election petition at a time many months before the section was enacted into law.[21] The Union did not oppose the withdrawal and took no steps itself toward obtaining a Board election after its inability to do so terminated in September 1959: indeed, it continued to picket long after the effective date of Section 8(b) (7), ceasing only when it was enjoined in May of 1960.[22] The Union is in no position to seek to take advantage of the employer's abortive petition, nor can it argue that election proceedings here were frustrated by a mere "formal defect," cf. National Labor Relations Board v. Local 182, International Brotherhood of Teamsters, Etc., 314 F.2d 53, 61 (2d Cir. 1963). There simply was no petition for an election before the Board at any time after the passage of Section 8(b) (7), or in fact any effort whatever by the Union to comply with that section.
 
 IV.
 
 59
 As we recently pointed out, "Problems arise under the First Amendment whenever picketing is restrained." Fruit and Vegetable Packers and Warehousemen, Local 760 v. National Labor Relations Board, 113 U.S.App.D.C. 356, 361, 308 F.2d 311, 316 (1962), cert. granted, 374 U.S. 804, 83 S.Ct. 1693, 10 L.Ed.2d 1030 (1963). Does Section 8(b) (7) (C), construed as we have construed it, raise such serious constitutional problems as to point to a different construction, or even to require that it be held invalid as it was here applied? Does the section, as we have construed it, comport with other provisions of the Federal labor legislation which protect the fundamental rights of labor, including the right to strike? Cf. Mastro Plastics Corp. v. National Labor Relations Board, supra.
 
 
 60
 In considering these questions, it is important to take into account the clear distinction between picketing addressed to employees — whether of the same employer or of other employers — and that which is addressed to members of the consuming public. The first type of picketing, as we pointed out in the Fruit and Vegetable Workers case, supra, is a "`signal' to act" to members of labor unions. See 113 U.S.App.D.C. at 361, 308 F.2d at 316. The second type, which was involved in the cited case, is informational in character, intended to publicize the nature of the claimed grievance. As to the first type, with which we are now dealing, it is clear that a state legislature can regulate "action" picketing so as to achieve an objective which the legislature reasonably thinks to be necessary in the public interest. See Hughes v. Superior Court, 339 U.S. 460, 70 S.Ct. 718, 94 L. Ed. 985 (1950); International Brotherhood of Teamsters Local 695, A.F.L. v. Vogt, Inc., 354 U.S. 284, 77 S.Ct. 1166, 1 L.Ed.2d 1347 (1957). The same power is certainly possessed by Congress. See International Brotherhood of Electrical Workers Local 501, A.F.L. v. National Labor Relations Board, 341 U.S. 694, 705, 71 S.Ct. 954, 95 L.Ed. 1299 (1951) (sustaining a congressional ban on picketing in aid of secondary boycotts).
 
 
 61
 In considering the reasonableness and constitutionality of the congressional action in adopting Section 8(b) (7), an important factor is the practical impact of the requirements of the section. Are those requirements unduly oppressive in actual operation? The answer to this question is partly to be found in the manner in which the section is administered by the Board. In this connection, the Board said in the Blinne case, supra, 135 N.L.R.B. at pp. 1165-66:
 
 
 62
 "* * * the fears that the statutory requirement for filing a timely petition will compel a union which has been the victim of unfair labor practices to undergo a coerced election are groundless. No action will be taken on that petition while unfair labor practice charges are pending, and until a valid election is held pursuant to that petition, the union's right to picket under the statutory scheme is unimpaired.
 
 
 63
 "On the other side of the coin, it may safely be assumed that groundless unfair labor practice charges in this area, because of the statutory priority accorded Section 8(b) (7) violations, will be quickly dismissed. Following such dismissal an election can be directed forthwith upon the subsisting petition, thereby effectuating the congressional purpose. Moreover, the fact that a timely petition is on file will protect the innocent union, which through a mistake of fact or law has filed a groundless unfair labor practice charge, from a finding of an 8(b) (7) (C) violation. * * *"
 
 
 64
 In its brief in the present case, the Board says:
 
 
 65
 "In terms of the facts of this case, the Union could have preserved its right to continue picketing by filing a timely representation petition and a Section 8(a) (5) charge. If, as it asserts, the Company refused to recognize it although the Company did not have a good faith doubt as to the Union's majority status, the refusal was violative of Section 8(a) (5), and a complaint would presumably have issued on the charge. In that event, no election would have been held on the petition, and the Union would have been free to continue picketing pending a resolution of the Section 8(a) (5) issue. On the other hand, had investigation of the Section 8(a) (5) charge proved it to be without merit, the petition would have protected the Union against having its picketing enjoined until an election had first been conducted, and, if the Union won the election, it would, of course, have remained free to continue picketing." (Pp. 39-40; footnotes omitted.)
 
 The Board's brief further states:
 
 66
 "The Board views a meritorious 8(a) (5) charge and a representation petition as mutually inconsistent, for the latter presupposes that a question concerning representation exists whereas the former presupposes that it does not. Accordingly, if a complaint has issued on an 8 (a) (5) charge, the Board will ordinarily not entertain a representation petition, or will dismiss one that may have been filed, involving the same employees, rather than hold the petition, pending remedial action, as it does in the case of other employer unfair labor practices. See Aiello Dairy Farms, 110 NLRB 1365, 1366-1370. However, it does not follow, as petitioner assumes, that, had it filed both a petition and an 8(a) (5) charge, the Board, at least in the circumstances of an 8(b) (7) (C) case, would have required it to make a choice between whether it wanted to proceed on the petition or on the charge. Rather, there is every reason to believe that the petition would have been held pending an investigation of the 8(a) (5) charge, and dismissed only if it were decided to issue a complaint thereon.
 
 
 67
 "Since a meritorious Section 8(a) (5) charge in effect moots a representation petition, the Board has held that, if a complaint alleging a refusal to bargain in violation of Section 8(a) (5) has issued, it would not find picketing for recognition purposes violative of Section 8(b) (7) (C) even though a representation petition had not been filed within a reasonable time from the commencement of the picketing. For, in these circumstances, the filing of a representation petition could not serve as the basis for an election; it would only be dismissed. Blinne, supra, 135 NLRB No. 121, p. 17, n. 24. But, the union which files a Section 8(a) (5) charge alone, without coupling it with a representation petition, takes the risk that, if no complaint issues on the charge, there would be no bar to proceeding to enjoin the picketing under Section 8 (b) (7) (C)." (Pp. 40-41, n. 42).
 
 
 68
 We rely upon these representations[23] in reaching our conclusion here that Section 8(b) (7) is not in fact oppressive in operation, or unduly restrictive of the rights given to labor by the Federal labor legislation generally. A ban on organizational or recognitional picketing only is effected, and that in narrowly defined circumstances. A majority union may continue its recognitional picketing beyond the permitted reasonable period, not to exceed 30 days, if it files a timely petition for an election. If it also claims unfair labor practices on the part of the employer, it may file charges with the General Counsel of the Board. Whether or not the General Counsel chooses to issue a complaint on such charges,[24] the union is protected. If no complaint on the unfair practice charge is issued, the union will still be free to continue its picketing and may, in the proceedings on its petition for an election, bring to the attention of the Board the effect of the claimed unfair labor practices on the prospects of holding a free and fair election. In such a case, the Board, if it considers that the unfair practices of the employer make a fair election impossible, would and should defer such election until it can be conducted in an atmosphere devoid of unfair pressures. On the other hand, if the General Counsel elects in his discretion to issue a complaint against the unfair labor practice of the employer, the petition for an election may, and in our view ordinarily should, be held in abeyance until the unfair practice charge is adjudicated and corrected. The picketing could lawfully continue. Then the fair election contemplated by the statute and decisions can be held.
 
 
 69
 The Board has indicated, however, that it makes a distinction between an 8(a) (5) violation and other unfair labor practices of the employer. If a complaint issues on an 8(a) (5) violation, the Board will not view picketing as violating Section 8(b) (7) and will dismiss the petition for an election if one has already been filed. We add to this that if the Board on its own initiative has dismissed the petition for an election, a union which has also filed an unfair labor practice charge under Section 8(a) (5) should not, and in our view will not, suffer. It may continue picketing without violating Section 8(b) (7), since it has filed a petition for an election. Regardless of whether or not the Board retains the petition the union is in compliance with the statute.
 
 
 70
 So viewed and so enforced, we think Section 8(b) (7) is without constitutional infirmity. The petitioner union urges that it is being driven to pursue public remedies, and is being deprived of its traditional private remedy of self-help. But in fact, as we have seen, a union which follows the Board's pattern of administration as outlined above can pursue its picketing — for recognitional as well as unfair labor practice purposes — without interruption or illegality. We think it clear that at all times after the effective date of Section 8(b) (7) the petitioner union had a course of action open to it by which it could have continued to picket without infringement of Section 8(b) (7) (C) — a course which could not have harmed its interests, and which would have comported with the congressional purpose of solving industrial disputes through the processes of the Board. The regulation of picketing imposed by Section 8(b) (7) thus appears to us to be far from severe, and well within the authority of Congress.
 
 V.
 
 71
 The dissent of our able colleague suggests that Section 8(b) (7) (C) should not be applied here because the picketing commenced many months before the effective date of the Act, and that accordingly the Union could not have complied literally with the statutory provision that it file a representation petition within 30 days from the commencement of its picketing.
 
 
 72
 The Board did not in any way condemn as illegal the picketing which occurred prior to the effective date of the Act — November 13, 1959. It was concerned only with the picketing which occurred after November 13, 1959, treating this picketing as commencing on that date for purposes of Section 8(b) (7) (C). In effect the holding was that within the meaning of Section 8(b) (7) (C) picketing already in progress is deemed to have commenced on the effective date of the section, and as to picketing begun after that date the picketing commences on the date it actually begins.
 
 
 73
 This construction is the only proper one, we think. Both the statutory context and reason indicate that Congress must have used the word "commencement" to connote the commencement of the specific picketing with which the section deals and to which it applies. We have been referred to nothing in the legislative history suggesting that Congress used "commencement" in any different sense — specifically to embrace picketing not comprehended by the section. The statutory language contains nothing to suggest a retroactive reach as to subject matter. The construction permits all persons subject to its terms to be treated equally, without special privilege or prejudice. Under it the Union here was accorded, after the effective date of the statute, the same reasonable period, not to exceed 30 days — as all others wishing to engage in picketing having a recognitional objective would have — in which to picket without filing a petition, and the same right to continue to picket after filing the petition. The construction also more fully serves the apparent congressional purpose of removing labor disputes with a representational objective from the streets and solving them by means of the Board's procedures. We find no doubt or ambiguity as to the meaning of the statute in this respect.
 
 
 74
 The Union here very properly concedes that the mere fact that its picketing started before the section became effective, and was legal at that time, does not protect it from the operation of the new statute. See Local 74, United Brotherhood of Carpenters & Joiners of America, A.F.L. v. National Labor Relations Board, 341 U.S. 707, 713-714, 71 S.Ct. 966, 95 L.Ed. 1309 (1951); Jeffery-DeWitt Insulator Co. v. National Labor Relations Board, 91 F.2d 134, 139, 112 A.L.R. 948 (4th Cir. 1937), cert. denied, 302 U.S. 731, 58 S.Ct. 55, 82 L.Ed. 565 (1937).
 
 
 75
 For these reasons, the order of the Board will be
 
 
 76
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 Although the Union was not in compliance with those provisions, it was entitled to recognition as the employees' bargaining representative if there was no "bona fide dispute as to the existence of the required majority of eligible employees." See United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 69, 76 S.Ct. 559, 563, 100 L.Ed. 941 (1956)
 
 
 [2]
 In Part II of this opinion we consider whether the Union has a defense against a charge under Section 8(b) (7) (C) if the Company engaged in the unfair labor practices proscribed by Section 8(a) (1) and (5), and in Part III we consider whether the filing of a petition and its withdrawal prior to the date Section 8(b) (7) became effective is a sufficient filing for purposes of that section
 
 
 [3]
 Cf. the colloquy between Senators Lausche and McClellan in the debate on adopting the Conference bill at 105 Cong. Rec. 17911 (1959), II Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 at 1444:
 "Mr. LAUSCHE. The same situation occurred as to organizational picketing. It was not dealt with in the original bill [S. 1555, the Kennedy-Ervin bill passed by the Senate originally].
 "Mr. McCLELLAN. Organizational picketing was not. Blackmail picketing was. Blackmail picketing is still in the bill. So now organizational picketing is also in the bill. I believe they are under separate titles. At least they are in separate sections."
 
 
 [4]
 As indicated above, the Board referred to this decision as giving the reasons governing its decision in the instant case
 
 
 [5]
 Had this provision been enacted, and assuming that the Union's majority status was not open to good faith doubt, it is plain that the Section 8(b) (7) charge here could not have been sustained
 
 
 [6]
 The resolution was allowed to lie over in the Senate until September 1, 1959, when it was placed on the calendar. 105 Cong.Rec. 17487. On September 2 the Conference Committee report was submitted to the Senate (105 Cong.Rec. 17818, II Legis.Hist. 1400), and the resolution apparently was never adopted
 
 
 [7]
 It may be noted that the version of Section 8(b) (7) as contained in the proposed resolution (105 Cong.Rec. 17332, II Legis.Hist. 1383) was the version ultimately reported by the Conference and enacted. Therefore, it is plain that the Democratic Senate conferees were able to persuade the Conference of the merits of their three qualifications as set out in their resolution
 
 
 [8]
 We note that our conclusion accords with that of Senator Morse, the only one of the Senate conferees who declined to sign the Conference report. On the floor of the Senate he stated his view of Section 8(b) (7) as adopted by the Conference as follows (105 Cong.Rec. 17885, II Legis.Hist. 1429):
 "The bill also prohibits picketing for recognition by a majority union for longer than 30 days, without filing a representation petition with the NLRB. This is true even if the union is overwhelmingly designated by the employees to represent them and the employer nevertheless declines to recognize it. The fundamental right to strike for recognition of a majority union is thus watered down to a right to strike for recognition only if the union also petitions for an election. Until today, recourse to the Board was an alternative to striking, not an indispensable adjunct to it."
 We may suppose that Senator Morse previously had stated to the Conference Committee his understanding of the section as finally drafted and approved, and his objections to it. Cf. however, his proposal to the Conference as to the form Section 8(b) (7) should take, at 105 Cong.Rec. 17881, II Legis.Hist. 1425, which apparently would not have permitted a majority union to strike for recognition unless currently certified or unless the employer was paying substandard wages.
 
 
 [9]
 In H.Conf.Rep. No. 1147, 86th Cong., 1st Sess. 41 (I Legis.Hist. 945) the conferees on the 1959 bill stated:
 "Section 8(b) (7) overrules the Curtis and Alloy cases to the extent that those decisions are inconsistent with section 8(b) (7)." U.S.Code Congressional and Administrative News 1959, p. 2513.
 The Curtis reference relates to our decision on Section 8(b) (1) in the Drivers Union case at 107 U.S.App.D.C. 42, 274 F.2d 551 (1958), which then was pending before the Supreme Court, and which was affirmed by that Court at 362 U.S. 274, 80 S.Ct. 706, 4 L.Ed.2d 710, in 1960. See 105 Cong.Rec. 14348, II Legis.Hist. 1523.
 
 
 [10]
 It may be that the statutory word "forcing" was used to indicate an object evidenced by more forceful action than that expressed by the word "requiring," but we need not reach that point here
 
 
 [11]
 A proviso to subsection (C) protects picketing which is informational in nature, and which does not have the effect of inducing employees of other employers "not to pick up, deliver or transport any goods or not to perform any services." The Union here does not rely on this proviso, presumably because its picketing was not regarded as coming within its terms. The pickets here carried "on strike" signs, and the appeal was not addressed solely to the public, or confined (as far as can be discerned) in its effects, in the manner contemplated by the proviso
 
 
 [12]
 This section reads:
 "(a) It shall be an unfair labor practice for an employer —
 "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of this Act;
 * * * * *
 "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a) of this Act."
 
 
 [13]
 The Board adopted the finding of the Trial Examiner that the employer's orders to certain non-supervisory employees with respect to joining the Union "amounted to interference, restraint and coercion." We assume that had it deemed the point material, the Board would have found a violation of Section 8(a) (1)
 We have held under Section 8(a) (5) "that an employer may refuse recognition to a union when motivated by a good faith doubt as to that union's majority status." Joy Silk Mills v. National Labor Relations Board, 87 U.S.App.D.C. 360, 369, 185 F.2d 732, 741 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L. Ed. 1350 (1951). See also United Mine Workers of America v. Arkansas Oak Flooring Co., supra, note 1; International Ladies' Garment Workers' Union A.F.L.-C.I.O. v. National Labor Relations Board, 108 U.S.App.D.C. 68, 280 F.2d 616 (1960), aff'd, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961); National Labor Relations Board v. Knickerbocker Plastic Co., 218 F.2d 917 (9th Cir. 1955); and see Mount Hope Finishing Co. v. National Labor Relations Board, 211 F.2d 365 (4th Cir. 1954); National Labor Relations Board v. Philamon Laboratories, 298 F.2d 176 (2d Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962). The Board here made no finding as to whether or not there was a good faith doubt. On the record before us it would seem that there was no such doubt.
 
 
 [14]
 Section 10(l) of that Act now reads in pertinent part:
 "(l) Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of * * * [section 8(b) (7)], the preliminary investigation of such charge shall be made forthwith * * *. If, after such investigation, the officer or regional attorney to whom the matter may be referred has reasonable cause to believe such charge is true and that a complaint should issue, he shall, on behalf of the Board, petition any United States district court [including the District Court of the United States for the District of Columbia] within any district where the unfair labor practice in question has occurred, is alleged to have occurred, or wherein such person resides or transacts business, for appropriate injunctive relief pending the final adjudication of the Board with respect to such matter. * * * Provided further, That such officer or regional attorney shall not apply for any restraining order under * * * [section 8(b) (7)] if a charge against the employer under * * * [section 8 (a) (2)] has been filed and after the preliminary investigation, he has reasonable cause to believe that such charge is true and that a complaint should issue. * * *" See also 29 U.S.C. § 160(l).
 
 
 [15]
 There appears to be no contention here that the employer's conduct falls within that proscribed by Section 8(a) (2)
 
 
 [16]
 On the floor of the Senate Senator Morse introduced for insertion in the Congressional Record his proposals "made in conference for a modification of the law in respect to * * * picketing problems." He stated "Mr. President, I have inserted my proposals in the RECORD because I want to show that I did my very best to try to work out some compromises on this subject. I demonstrated by these proposals my willingness to go along with some modifications on the subject of secondary boycotts * * *." 105 Cong.Rec. 17881, II Legis. Hist. 1425. His proposals included an amendment to Section 10(l) substantially like that in the original bill, S. 1555, providing that an unfair labor practice of the employer under Section 8(a) will be a defense to a Section 8(b) (7) charge.
 
 
 [17]
 As indicated above in footnote 8, Senator Morse stated at length on the floor of the Senate his objections to the Conference bill as reported. He had this to say about the Section 10(l) amendments as adopted (105 Cong.Rec. 17884-85, II Legis.Hist. 1428-29):
 "Let us look at some of the worst features of the ban on organizational picketing.
 * * * * *
 "(b) The Senate bill contained a provision saying, in effect, that where the employer committed unfair labor practices, the union had a right to picket for organizational purposes. The bill now before us preserves an unimportant shred of this provision. Company union cases in violation of 8(a) (2) of the act are difficult to prove and constitute a small part of the Board's business. The important unfair labor practices in this context are antiunion threats and discriminatory discharges.
 "The House conferees insisted that a picket line protesting unfair labor practices would not be a violation of the antipicketing provisions of their bill. But why did they steadfastly refuse to say so in their bill? Everyone knows that protest picketing when the union has not gained recognition contains at least a substantial objective of promoting organization. In this connection, I refer to an analysis appearing on page 16490 of the RECORD. This analysis was inserted by the Senator from Arizona [Mr. Goldwater], who was so active in advocating the provision now before us:
 "`The impact of this change (a suit for damages in addition to the unfair labor practice) is particularly serious in view of the fact that such picketing is prohibited if an object is recognition or organization. Few instances of picketing will be found where at least a remote objective of the union cannot be found to be related to recognition. * * * In addition, in the absence of clear legislative history showing a contrary intention, this provision might make it an unfair labor practice to picket against an employer's unfair labor practice in many instances, since frequently it may be found that organization is also an object.'
 "I do not think my fears are groundless." (Emphasis supplied.)
 The full text of the quoted portion of Senator Goldwater's analysis appears in footnote 18, infra. The statement that "I do not think my fears are groundless" was made of course by Senator Morse, and not by Senator Goldwater.
 
 
 [18]
 On August 20, 1959, before the Conference had agreed on the final version, Senator Goldwater inserted in the Congressional Record a "List of Differences, and Comment Thereon, Between Senate-Passed and House-Passed Labor Reform Bill, S. 1555 (Listed in the Order of the Sections of the House Bill)," which had been requested by some of his colleagues and was prepared by his staff. 105 Cong.Rec. 16487, II Legis.Hist. 1357. This analysis contained the following (quoted in part by Senator Morse on the floor of the Senate, see fn. 17,supra):
 "Section 705(c): Organizational and recognition picketing.
 "Comment: The provisions of the House bill are more nearly in line with the administration's proposals in this area than are those in the Senate bill. They are, however, broader in their scope and more restrictive on picketing than the administration proposal. Also, they contain a provision opening up unions to damage suits for such picketing, no matter how peaceful.
 "Making peaceful picketing subject to actions for damages in Federal as well as State courts is a serious departure from present labor policy. The impact of this change on uniformity in labor law is particularly serious in view of the fact that such picketing is prohibited if an object is recognition or organization. Few instances of picketing will be found where at least a remote objective of the union cannot be found to be related to recognition. * * * In addition, in the absence of clear legislative history showing a contrary intention, this provision might make it an unfair labor practice to picket against an employer's unfair labor practices in many instances, since frequently it may be found that organization is also an object.
 * * * * *
 "Differences: The House bill bans such picketing for 12 months after an election where `no union' is certified. The Senate bill bans it for 9 months after such election and an employer unfair labor practice is a defense to a charge filed under this provision." (Emphasis added.)
 
 
 [19]
 The Board's brief suggests that:
 "The quid pro quo for the Senate Conferees finally agreeing to such a narrow provision was apparently the willingness of the House Conferees to drop the provision of the Landrum-Griffin bill providing for private suits for damages * * * [Sec. 705(e) of H.R. 8400, I Legis.Hist. 685]. See the Loftus article, supra [New York Times, Sept. 2, 1959, pp. 1, 15] and the article by Robert D. Novak in the Wall Street Journal, Sept. 3, 1959 p. 3."
 
 
 [20]
 Compare Mastro Plastics, 350 U.S. at 288-289, 76 S.Ct. at 360-361, 100 L.Ed. 309, which rejected the notion that an unsuccessful congressional minority, by stating its fear that Section 8(d) as then enacted would be applicable to unfair practice strikes, could "put words into the mouths of the majority and thus, indirectly, amend a bill."
 
 
 [21]
 It is clear, of course, that ordinarily the Act permits either the employer or the union to file
 
 
 [22]
 The injunction was later dissolved, on motion of the Union, by reason of the Board's delays in the unfair labor practice case. See Getreu v. International Typographical Union, 205 F.Supp. 931 (S.D.Ohio 1962)
 
 
 [23]
 The Union is here urging, of course, that the Company employer committed unfair labor practices not only in violation of Section 8(a) (5), but also in violation of Section 8(a) (1). If a charge as to the 8(a) (1) violation had been filed, there would be no inconsistency between the charge and a petition for representation, and the Board, as it states, would hold the petition, until remedial action with respect to the charge had been had, and only then hold the election. In the meantime, the strike could lawfully continue
 
 
 [24]
 True, the exercise of the discretion of the General Counsel, in deciding whether or not he will issue a complaint, is largely unreviewable. International Union of Electrical, Radio and Machine Workers v. National Labor Relations Board, 110 U.S.App.D.C. 91, 94-96, 289 F.2d 757, 760-762 (1960). But this, it seems to us, does not adversely affect the position of the complaining union in respect of problems arising under Section 8(b) (7)
 FAHY, Circuit Judge (dissenting).
 Though he recommended on other grounds that the complaint be dismissed the trial examiner in his intermediate report also stated:
 "As Section 8(b) (7) (C) did not become law until months `after the commencement of the picketing,' which was legal at its inception, thus making it impossible for the Respondent here to comply with the literal interpretation of the requirements of filing a petition within 30 days of the commencement of the picketing * * * it would seem that this literal interpretation of § 8 (b) (7) (C) would require the dismissal of the complaint herein"
 The Board passed over this comment; and the Union petitioners disclaim reliance upon the position indicated. Nevertheless, in my opinion Section 8(b) (7) (C), which did not become effective until November 13, 1959, does not apply to the facts of this case. The picketing commenced in April 1959 so that the petitioners could not comply with the provisions of the new section literally construed, for the reason that much more than thirty days had passed after the commencement of the picketing and before the new provision became effective. Thus by its own terms the provision does not cover this case.
 The status of the local Union among the employees might well have changed substantially during the period between April and November. It might have had a majority in April and have lost it by the later date. And had the provision in question been in effect in April the picketing might not have commenced. For these reasons the literal reading of the provision has more than academic significance. In view of this I do not think it should be construed so as to apply to this case in the absence of clear language in the Act itself or in its legislative history indicating that such was the intent of Congress. Moreover, giving the language its plain meaning avoids the necessity of passing upon the difficult First Amendment questions which otherwise confront the court, and, in addition, conforms with the warning of Section 13 of the Act:
 "Nothing in this Act, except as specifically provided for herein, shall be construed so as either to interfere with or impede or diminish in any way the right to strike, or to affect the limitations or qualifications on that right."
 Accordingly I would set aside the order of the Board and direct that the complaint be dismissed.[1]
 Notes:
 
 
 [1]
 It is possible that there were instances in which some picketing began less than 30 days before the effective date of the Act and continued thereafter. In such a case no doubt the Board, if the Act were invoked, would determine whether the remaining portion of the thirty-day period afforded in all the circumstances a reasonable period within which to file a petition under Section 9(c). If so, the section would apply; if not, it would not apply